UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | S1 17 Cr. 220 (JAM) |
| v. | February 6, 2018 |
| ANDRE FLOTRON, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
TO DISMISS THE SUPERSEDING INDICTMENT OR, IN THE
ALTERNATIVE, TO STRIKE PREJUDICIAL SURPLUSAGE**

GREENBERG TRAURIG LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
*Attorneys for Defendant Andre Flotron*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

STATEMENT OF FACTS ............................................................................................................ 3

ARGUMENT ................................................................................................................................ 5

I.      THE COMMODITIES FRAUD CHARGES ARE LEGALLY INSUFFICIENT ................. 6

      A.      Relevant Law ................................................................................................. 6

      B.      The Government Has Not Sufficiently Pleaded a Scheme to Defraud or Fraudulent Intent ......................................................................................... 10

              1.      Mr. Flotron Did Not Make Any Misrepresentations ............................... 11

              2.      Mr. Flotron Did Not Have Fraudulent Intent............................................ 12

              3.      The Coscia Decision Is Non-Binding and Easily Distinguishable ......................................................................................... 13

II.     THE COMMODITIES FRAUD AND SPOOFING CHARGES ARE UNCONSTITUTIONALLY VAGUE AS APPLIED TO MR. FLOTRON ....................... 15

      A.      Relevant Law ............................................................................................... 16

      B.      The Commodities Fraud Statute Is Void for Vagueness as Applied to Mr. Flotron .................................................................................................. 17

      C.      The Anti-Spoofing Provision Is Void for Vagueness as Applied to Mr. Flotron ........................................................................................................ 17

              1.      The Origin of the "Anti-Spoofing" Provision........................................ 18

              2.      The CFTC's Rulemaking Process........................................................... 18

              3.      The CFTC's Proposed Interpretive Order............................................... 20

              4.      CME Group's Anti-Spoofing Rules........................................................ 22

              5.      The "Anti-Spoofing" Provision Does Not Provide Fair Notice of What Trading Activity Constitutes Spoofing ..................................... 22

              6.      CFTC's Subsequent Interpretive Guidance Does Not Cure the Vagueness As Applied to Mr. Flotron's Trading Activity ..................... 24

III.    PREJUDICIAL SURPLUSAGE SHOULD BE STRICKEN FROM
        THE INDICTMENT ........................................................................................................ 26

CONCLUSION .......................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Arriaga v. Mukasey*,
 521 F.3d 219 (2d Cir. 2008).......................................................................... 16

*Chatin v. Coombe*,
 186 F.3d 82 (2d Cir. 1999)............................................................................. 16

*City of Chicago v. Morales*,
 527 U.S. 41 (1999)......................................................................................... 25

*Farrell v. Burke*,
 449 F.3d 470 (2d Cir. 2006)........................................................................... 23

*GFL Advantage Fund, Ltd. v. Colkitt*,
 272 F.3d 189 (3d Cir. 2001)............................................................................. 8

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972)....................................................................................... 24

*Hamling v. United States*,
 418 U.S. 87 (1974)........................................................................................... 5

*Lanzetta v. New Jersey*,
 306 U.S. 451 (1939)....................................................................................... 25

*Mannix v. Phillips*,
 619 F.3d 187 (2d Cir. 2010)........................................................................... 16

*Smith v. Goguen*,
 415 U.S. 566 (1974)....................................................................................... 23

*United States v. Cooper*,
 384 F. Supp. 2d 958 (W.D. Va. 2005).......................................................... 29

*United States v. Coscia*,
 866 F.3d 782 (7th Cir. 2017) .................................................................. passim

*United States v. Espy*,
 23 F. Supp. 2d 1 (D.D.C. 1998)..................................................................... 27

*United States v. Finnerty*,
 533 F.3d 143 (2d Cir. 2008)................................................................. 8, 9, 12

*United States v. Greebel*,
No. 15-CR-637 (KAM), 2017 WL 3610570 (E.D.N.Y. Aug. 4, 2017) .......................... 26

*United States v. Heicklen*,
858 F. Supp. 2d 256 (S.D.N.Y. 2012) ................................................................. 6

*United States v. Hubbard*,
474 F. Supp. 64 (D.D.C. 1979) ......................................................................... 27

*United States v. Lanier*,
520 U.S. 259 (1997) ......................................................................................... 25

*United States v. Lavin*,
504 F. Supp. 1356 (N.D. Ill. 1981) ................................................................... 29

*United States v. Mahaffy*,
693 F.3d 113 (2d Cir. 2012) ............................................................................... 6

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000) ................................................................................. 5

*United States v. Poindexter*,
725 F. Supp. 13 (D.D.C. 1989) ......................................................................... 29

*United States v. Radley*,
659 F. Supp. 2d 803 (S.D. Tex. 2009) ................................................... 7, 12, 15

*United States v. Radley*,
632 F.3d 177 (5th Cir. 2011) .............................................................................. 8

*United States v. Scarpa*,
913 F.2d 993 (2d Cir. 1990) ............................................................................. 26

*United States v. Wilson*,
565 F. Supp. 1416 (S.D.N.Y. 1983) ................................................................. 29

*Williams v. United States*,
458 U.S. 279 (1982) ......................................................................................... 11

*Winters v. New York*,
333 U.S. 507 (1948) ......................................................................................... 16

**Statutes**

7 U.S.C. § 6c(a)(5)(C) ............................................................................................. 3, 18, 22, 25

7 U.S.C. § 13(a)(2) ............................................................................................................. 18

18 U.S.C. § 2 ....................................................................................................................... 3

18 U.S.C. § 371 ................................................................................................................... 3

18 U.S.C. § 1348 ................................................................................................... 3, 6, 15, 17

**Regulations**

75 Fed. Reg. 67,301 (Nov. 2, 2010) ................................................................................. 19

76 Fed. Reg. 14,943 (March 18, 2011) ............................................................................. 21

78 Fed. Reg. 31,890 (May 28, 2013) ............................................................................ 21, 26

**Other Authorities**

CFTC Open Meeting on the Twelfth Series of Proposed Rulemakings Under the
        Dodd-Frank Act (Feb. 24, 2011) ............................................................................ 20, 21

CFTC Staff Roundtable on Disruptive Trading Practices (Dec. 2, 2010) ..................................... 19

NYMEX Rulebook ............................................................................................................... 4

## PRELIMINARY STATEMENT

The Superseding Indictment (Dkt. No. 58, "Indictment") returned against Andre Flotron pushes the boundaries of the commodities fraud statute and the "anti-spoofing" provision of the Commodity Exchange Act ("CEA") well beyond their legal limits to encompass legitimate and commonplace market conduct.  Even viewed in the light most favorable to the government, the allegations against Mr. Flotron describe nothing more than bona fide precious metals trading activity that was not improper, let alone criminal.

The government's characterization of Mr. Flotron's trading activity as fraudulent is misguided.  Every buy or sell order placed into the market by Mr. Flotron was a bona fide order available to be traded against by any market participant who chose to do so.  By entering these orders, even if they were canceled prior to execution, Mr. Flotron made no false or fraudulent representation to any other market participant.   The absence of any false or fraudulent representations by Mr. Flotron, or any corresponding fraudulent intent on his part, requires dismissal of the charges of commodities fraud and conspiracy to commit commodities fraud.

The spoofing charges must also be dismissed because the CEA's anti-spoofing provision is unconstitutionally vague as applied to Mr. Flotron, and prosecuting him under this statute violates his right to due process.  The terse parenthetical definition of "spoofing" in the CEA is ambiguous, and the term has no accepted meaning in the financial services industry.  For years after the provision became effective in July 2011 – and throughout the time of the alleged conduct – there was rampant confusion among market participants, government officials, regulatory agencies, and self-regulatory organizations over the meaning and scope of the provision.  It was not until May 2013, a mere six months before the end of the alleged six-year conspiracy period, that the Commodity Futures Trading Commission ("CFTC") even issued non-

binding "interpretive guidance" that attempted to clarify the scope of the anti-spoofing provision. And it was another year before the electronic exchange on which Mr. Flotron traded introduced a rule that defined spoofing. Consequently, the CEA's anti-spoofing provision is unconstitutionally vague as applied to Mr. Flotron's alleged conduct, which consisted of nothing more than manually entering valid orders into the futures market, and subsequently canceling some of the unexecuted orders after a period of time.

*United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017) is the only case to date in which a trial defendant was convicted of spoofing. But the *Coscia* case, even if viewed as persuasive authority by this Court, only confirms the deficiencies of the Indictment here. Coscia designed high-speed sophisticated computer algorithms to place multiple layers of large orders into the market almost simultaneously and automatically cancel those orders within milliseconds. In other words, at the time Coscia flashed those large orders into the market, they were already pre-programmed to evade execution. Thus, there was evidence that Coscia's orders were illusory and merely intended to create artificial shifts in supply and demand while avoiding execution. The conduct alleged against Mr. Flotron here is starkly different. Mr. Flotron had no such computer programs; he never layered orders to artificially simulate market depth; his orders remained open for substantial periods of time during which they could be executed by any market participant; and he never pre-programmed orders to cancel or evade execution. Consequently, Coscia's conviction does nothing to salvage the government's case here, and all charges against Mr. Flotron should be dismissed.

## BACKGROUND

Andre Flotron is a Swiss citizen who worked as a precious metals trader for UBS and its predecessor, Swiss Bank Corporation, for over thirty years. During the time of the government's

alleged conspiracy, Mr. Flotron worked at UBS's offices in Stamford, Connecticut, from 2008 to 2010, and then in Zurich, Switzerland, from 2010 to 2013.  He retired in 2013.

Nearly four years after his retirement, Mr. Flotron was arrested upon a criminal complaint while visiting his longtime girlfriend in New Jersey.  On or about September 26, 2017, a grand jury in the District of Connecticut issued a one-count indictment that charged Mr. Flotron with conspiracy to commit wire fraud, commodities fraud, and spoofing in the District of Connecticut and elsewhere, in violation of Title 18 U.S.C. § 371.

On or about January 30, 2018, a grand jury in the District of Connecticut issued a seven-count Superseding Indictment.  Count One charged Mr. Flotron with conspiracy to commit commodities fraud in the District of Connecticut and elsewhere, in violation of Title 18 U.S.C. § 1349.  Counts Two through Four charged Mr. Flotron with commodities fraud in the Northern District of Illinois, in violation of Title 18 U.S.C. §§ 1348 and 2.  Counts Five through Seven charged Mr. Flotron with spoofing in the Northern District of Illinois, in violation of Title 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2) and Title 18 U.S.C. § 2.

## STATEMENT OF FACTS

A significant portion of Mr. Flotron's responsibilities as a precious metals trader involved buying and selling futures contracts on behalf of UBS on an electronic exchange called COMEX. A futures contract is a standardized, legally binding agreement that, once executed, obligates the seller of the contract to deliver to the buyer a specific amount of a certain product (in this case, a precious metal such as gold or silver) on a specified future date.  On a given day, hundreds of thousands of precious metals futures contracts are bought and sold on COMEX.

COMEX is an anonymous exchange.  A participant trading a precious metals futures contract on COMEX does not know the identity of the counterparty from whom it is buying, or

3

to whom it is selling.  That participant simply agrees to the amount of precious metal to be bought or sold, the purchase or sale price, and the date of delivery under the contract.

All orders placed on COMEX are binding as long as they are active.  Once one counterparty places a bid to buy futures at a price currently being offered for sale by another counterparty (or vice versa), COMEX automatically executes a transaction between the two sides, and both counterparties of the contract are instantaneously bound.  There are no additional steps that must be completed to finalize the transaction.  *See* NYMEX Rulebook, Chapter 5, Rule No. 522 ("In electronic trading, while outstanding, all or any part of any bid or offer is subject to immediate acceptance by any trader.  Members are required to honor all bids or offers which have not been withdrawn from the market.").

However, before an order has been executed, it can be modified or canceled by whomever placed it.  It is undisputed that cancellation of orders is entirely permissible under COMEX rules.  *See, e.g.*, NYMEX Rulebook Definitions at 5-6 (listing various Order Types including "Good 'Till Cancelled," "[a]n order which will remain in force until executed, canceled or the contract expires").  Indeed, cancellations are commonplace and routine.  According to then-Chairman of the CFTC Gary Gensler, "[a]n estimated 80 to 90 orders are put into futures markets for every trade that actually happens."  Scott Patterson, *CFTC Targets Rapid Trades,* Wall Street Journal, March 15, 2012. Mary Schapiro, then-Chairwoman of the SEC, similarly stated in 2010 that many trading firms "cancel 90 percent or more of the orders they submit to the markets."  Mary L. Schapiro, Chairwoman of the SEC, Address at the Economic Club of New York:  Strengthening Our Market Equity Structure (Sept. 7, 2010) (transcript available at http://www.sec.gov/news/speech/2010/spch090710mls.htm).

The Indictment alleges that Mr. Flotron committed commodities fraud and violated the anti-spoofing provision of the CEA by placing orders to buy and sell precious metals futures contracts on COMEX that he intended to cancel before execution.  According to the Indictment, Mr. Flotron placed larger orders (so-called "Trick Orders") in order to push market prices up or down, and then executed smaller orders on the opposite side of the market ("Genuine Orders") "at prices, quantities, and at times that otherwise would not have been available."  Indictment ¶ 16.  The Indictment alleges that the "Trick Orders . . . were designed and intended to deceive other participants in the market for precious metals future contracts by injecting materially false and misleading information about increased supply or demand."  Indictment ¶ 15.

As for the composition of the alleged conspiracy, the Indictment alleges in vague and bare-bones terms that "FLOTRON demonstrated, explained, and trained at least one co-conspirator at UBS in the process of placing Trick Orders, placing Genuine Orders, and canceling the Trick Orders," and that "[b]etween approximately July 2008 and approximately November 2013, FLOTRON and his co-conspirators placed hundreds of Trick Orders for precious metals futures contracts in an effort to cause Genuine Orders placed by FLOTRON and his co-conspirators to be filled at prices, quantities, and at times that they otherwise would not." Indictment ¶¶ 19-20.  The Indictment does not specifically identify any alleged co-conspirators.

## ARGUMENT

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) ("A criminal defendant is entitled to an indictment that states the essential elements of

the charge against him."). Pursuant to Rule 12 of the Federal Rules of Criminal Procedure, an

indictment is properly subject to dismissal before trial if it is legally insufficient. "The

sufficiency of an indictment and the interpretation of a federal statute are both matters of law,"

and are thus properly reviewed on a motion to dismiss. *United States v. Heicklen*, 858 F. Supp.

2d 256, 262 (S.D.N.Y. 2012) (quoting *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir.

2012)).

## I.   THE COMMODITIES FRAUD CHARGES ARE LEGALLY INSUFFICIENT

The charges of commodities fraud and conspiracy to commit commodities fraud are

fatally flawed because the government cannot establish fraudulent intent or a scheme to defraud.

All of Mr. Flotron's orders were bona fide and subject to execution by any other market

participant. Any resulting shift in market demand was also bona fide and reflected an actual

increase or decrease in the number of orders currently available in the market. Therefore, Mr.

Flotron's orders were not fraudulent as a matter of law.

### A.   Relevant Law

Section 1348 of Title 18 of the United States Code makes it a felony to:

> knowingly execute[], or attempt[] to execute, a scheme or artifice—
> (1) to defraud any person in connection with any commodity for future delivery,
> or any option on a commodity for future delivery . . . ; or
> (2) to obtain, by means of false or fraudulent pretenses, representations, or
> promises, any money or property in connection with the purchase or sale of any
> commodity for future delivery, or any option on a commodity for future
> delivery . . . .

To establish a claim for commodities fraud, the government must allege, "(1) fraudulent intent,

(2) scheme or artifice to defraud, and (3) nexus with a security." *United States v. Mahaffy*, 693

F.3d 113, 125 (2d Cir. 2012) (citing *United States v. Motz*, 652 F. Supp. 2d 284, 294 (E.D.N.Y.

2009)).

In *United States v. Radley*, 659 F. Supp. 2d 803 (S.D. Tex. 2009), *aff'd*, 632 F.3d 177 (5th Cir. 2011), the district court dealt with a similar scenario to this case. The government charged the defendants, former employees of BP American Production Company, with wire fraud and price manipulation under the CEA for allegedly scheming to manipulate the price of Texas Eastern Transmission Corporation ("TET") propane by buying large quantities and then submitting "fraudulent" bids and offers on an electronic platform known as Chalkboard. *Id.* at 806. The government alleged that the defendants "repeatedly posted bids on Chalkboard for the highest prevailing price" so that other parties accessing Chalkboard would increase their bids. *Id.* at 815. Additionally, the defendants purportedly "stacked" bids on Chalkboard, meaning that they placed multiple bids at the same time "to give the impression that more than one person desired to purchase TET propane." *Id.*

The district court granted the defendants' motion to dismiss. The court found that, while the defendants may have caused the price of TET propane to increase, their actions did not cause *artificial* price increases since the defendants were willing and able to transact if counterparties accepted their bids:

> The superceding indictment does not allege a single lie or misrepresentation. The "best bids," even if they were higher than any others, were actually bids, and when they were accepted, defendants actually went through with the transactions. Other counterparties may have assumed that the "stacked bids" came from multiple parties, but defendants did not perpetuate or cause this misconception. Since defendants were willing and able to follow through on all of the bids, they were not misleading.

*Id.* (footnotes omitted).

In affirming the district court's decision, the Fifth Circuit made the following observations about the defendants' bids and offers for TET propane:

> To focus, as the government does, on the possibility that the bids could convey information about the number of buyers for TET propane is to overlook the bids'

7

legitimacy.  Unlike the false reports in *Futch,* the bids in this case were real; a counter-party could have accepted them and formed an enforceable contract at any time.  Indeed, that event occurred routinely, proving that the bids were genuine.  The indictment misses this point and instead recasts both successful and unsuccessful bids as proof of malfeasance. . . .  While weaving its damned-if-you-do-damned-if-you-don't web, the indictment demonstrates that Appellees' bids were bona fide and that other market participants freely chose which bids to accept and which to reject.  Unless they were somehow illusory, which was not the case, Appellees' bids were part of their transactions in February TET propane futures.

*United States v. Radley*, 632 F.3d 177, 183-84 (5th Cir. 2011).

The Second Circuit's decision in *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008), is also instructive.  In that case, the government charged a New York Stock Exchange floor broker with securities fraud for engaging in "interpositioning," *i.e.*, instead of pairing off matching customers' bids and offers as NYSE rules required, the defendant "interposed" his own trading book in the middle of the transactions, earning unnecessary bid/ask spreads on each leg of the transactions.  *See* 533 F.3d at 147 & n.2.  The court rejected the argument that some customers may have been misled by an implicit assumption that defendant would comply with stock exchange rules; "unless their understanding was based on a statement or conduct by Finnerty," he could not be held liable.  *Id*. at 150.  The court observed that although the concept of deception embodied in Rule 10b-5 is "broad," "[t]he government has identified no way in which Finnerty communicated anything to his customers, let alone anything false."  *Id*. at 148-49.  The court concluded that "characterizing Finnerty's conduct as 'self-evidently deceptive' is conclusory; there must be some proof of manipulation or a false statement, breach of a duty to disclose, or deceptive communicative conduct."  *Id*. at 150.

Similarly, in *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001), the Third Circuit rejected the plaintiff's argument that the defendant manipulated the market in violation of Rule 10b-5 by short selling stock to depress the price of certain securities.  The court found that

the defendant had not "inject[ed] false inaccurate information into the market or creat[ed] a false impression of supply and demand," despite the possibility that the "short sales may have contributed to a decline in the stocks' prices [because] there [was] no reason to believe these prices were depressed *artificially*."  *Id.* at 207 (emphasis added).  The court also rejected claims of securities fraud because "short sales . . . not only are lawful, but also do not distort markets or create a false impression of supply and demand because they are legitimate transactions with real buyers on the other side."  *Id.* at 214.

Finally, the Seventh Circuit's decision in *United States v. Coscia* is also instructive. Michael Coscia is the only defendant ever convicted at trial on criminal charges related to spoofing.  The government charged Coscia with six counts of commodities fraud and six counts of spoofing in violation of the CEA, relating to his trading activity over a ten-week period in 2011.  He owned his own proprietary, high-frequency trading firm and traded futures on multiple electronic exchanges and in several markets, including crude oil, metals, and agricultural commodities.  The evidence at trial showed that Coscia hired a computer programmer to design two algorithms called Flash Trader and Quote Trader, which Coscia used to place small orders for a particular commodity near the current market price.  The algorithms would then place multiple layers of very large orders in quick succession on the opposite side of the market that, in the words of the computer programmer who testified at trial, would "act like a decoy" and "pump the market."  866 F.3d 782, 789 (7th Cir. 2017) (internal quotation marks omitted).  As the Seventh Circuit stated, these very large orders were "designed specifically to avoid being filled and accordingly would be canceled in three particular circumstances:  (1) based on the passage of time (usually measured in milliseconds); (2) the partial filling of the large orders; or (3) complete filling of the small orders."  *Id.*  In other words, at the time Coscia placed these

orders, they were pre-programmed to cancel within milliseconds under any possible circumstance.  Using these algorithms, Coscia placed approximately 450,000 large orders in several futures markets over a ten-week period and earned approximately $1.4 million in profits. *Id.* at 788, 801.  Coscia was convicted on the spoofing and commodities fraud charges.

Coscia appealed to the Seventh Circuit, arguing in part that his commodities fraud conviction could not stand due to the absence of fraudulent intent.  While the court rejected that argument, it did so based on Coscia's use of an algorithmic computer program that was pre-programmed to evade execution by canceling orders in milliseconds.  The court stated that Coscia's algorithms were:

> intended to create the *illusion* of market movement. With Park [the computer programmer], Mr. Coscia *designed* a system that used large orders to inflate or deflate prices, *while also structuring that system to avoid the filling of large orders.*  The specific parameters of Mr. Coscia's programs . . . suggests, strongly, fraudulent intent.  The programs facilitated the consummation of small orders and actively avoided the completion of large orders.

*Id.* at 797 (emphasis in original).

The court rejected Coscia's attempt to analogize his case to *Radley* for the same reason: *Radley* did not involve "the development of a specific program to create the illusion of artificial market movement that included the use of large orders to inflate the price while also taking steps to avoid transactions in the large orders."  *Id.* at 797 n.64.[1]

## B. The Government Has Not Sufficiently Pleaded a Scheme to Defraud or Fraudulent Intent

There was absolutely nothing false, deceptive, or materially misleading about the so-called "Trick Orders" placed on COMEX by Mr. Flotron.  Every single order placed by Mr. Flotron was available to be filled by any other interested market participant.  Additionally, there

is no allegation that Mr. Flotron or UBS ever failed to honor any of their futures orders.  To the contrary, whenever another market participant accepted one of Mr. Flotron's bids or offers, it resulted in an executed transaction.

### 1. Mr. Flotron Did Not Make Any Misrepresentations

Mr. Flotron did not make any misrepresentations to the market that could form the basis for commodities fraud because Mr. Flotron's orders, in and of themselves, did not constitute representations at all.  The Supreme Court employed similar logic in the context of an allegedly fraudulent checking scheme in *Williams v. United States*, 458 U.S. 279 (1982).  In that case, the defendant knowingly deposited checks at several banks for which the defendants' accounts did not have sufficient funds.  The Court observed that:

> [a]lthough petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason:  technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." . . . Each check did not . . . make any representation as to the state of petitioner's bank balance.

*Williams*, 458 U.S. at 284-85.

For this reason, the Court vacated the defendant's conviction for knowingly making false statements to a bank regarding the value of a security.  Similarly, here, Mr. Flotron's orders were not factual assertions that could be characterized as true or false.  They were merely valid and anonymous orders placed on COMEX for specific amounts of precious metals at certain prices.

Even if Mr. Flotron arguably made a representation by placing his orders, it was nothing more than a representation that UBS was willing to buy or sell a certain number of futures at a stated price.  That representation was indisputably true, equally so for every single order placed

---

[1] On February 2, 2018, Coscia filed a Petition for Writ of Certiorari with the Supreme Court.  *United States v. Coscia* (S. Ct. filed Feb. 2, 2018).

by Mr. Flotron, whether filled or not.  While the government has conclusorily alleged that Mr. Flotron "inject[ed] materially false and misleading information about increased supply or demand," Indictment ¶ 15, that is a baseless legal conclusion, and cannot be true.  All of Mr. Flotron's orders – including the so-called "Trick Orders" – *did* increase supply or demand.  For example, if Mr. Flotron placed an order to sell 55 gold futures at a particular price, that order represented a *real* increase in supply, because the order was then active on COMEX and any market participant could choose to accept it and purchase 55 gold futures from UBS at that price. An order, once executed, must be honored.  The simple fact that an order may be canceled seconds or minutes after being placed does not in any way demonstrate that the order was deceptive or misleading when entered and active.  It is undisputed that cancellation of futures orders in electronic exchanges such as COMEX is an extremely frequent occurrence, which is standard market practice and entirely permissible under the rules of the exchange.

### 2. *Mr. Flotron Did Not Have Fraudulent Intent*

As in *Radley*, the government has incorrectly premised its fraud charges on the entry of legitimate, executable orders into an electronic marketplace.  Mr. Flotron, however, was "willing and able to follow through on all of the bids[.]  [Thus], they were not misleading." *Radley*, 659 F. Supp. 2d at 815.  And as in *Finnerty*, the government has attempted to conclusorily categorize Mr. Flotron's conduct as "self-evidently deceptive," despite the absence of any "proof of manipulation or a false statement, breach of a duty to disclose, or deceptive communicative conduct."  533 F.3d at 150.  This Court should follow the same logic employed by the courts in those cases and dismiss charges against Mr. Flotron due to the lack of any fraudulent representation or scheme.

3.      *The Coscia Decision Is Non-Binding and Easily Distinguishable*

While not binding, even if this Court were to follow the logic employed by the Seventh Circuit to affirm Coscia's conviction for commodities fraud, it would still call for dismissal of the Indictment.  Mr. Flotron's alleged trading activity in this case is completely different from the trading activity carried out by Coscia.  It is undisputed that Mr. Flotron did not employ any algorithmic trading programs akin to the one used by Coscia.  Nor does the government allege that Mr. Flotron placed multiple layers of bids or offers into the market at the same time to create an artificial illusion of supply or demand, or a false impression of market depth.  Most importantly, unlike the large orders placed by Coscia – ***which were pre-programmed at the time they were placed to be canceled within milliseconds to avoid execution*** – all of Mr. Flotron's so-called "Trick Orders" were valid orders, active on the market for an ample amount of time to be executed.  Nearly all of Mr. Flotron's allegedly deceptive orders were active for several seconds, some up to a minute.[2]  In a market dominated by high-speed, computerized trading firms that react to orders within milliseconds, or even microseconds, that was many thousands of times longer than necessary for other market participants to execute and fill those orders.  Indeed, as the Seventh Circuit explained, high-frequency trading "opened the door to spoofing," which "utilizes extremely fast trading strategies," where "large orders will be on the market for incredibly short periods of time (fractions of a second)" before being canceled "within

---

[2] This statement is based on the government's disclosed list of 1,273 orders – characterized by the government in court as "potential spoofing instances" – allegedly entered by Mr. Flotron or the alleged co-conspirator between January 2008 and November 2013.  *See* Dec. 4, 2017 Tr. at 13.  According to the disclosures, these "Orders of Interest" were canceled prior to execution, but were active while other orders were filled on the opposite side of the market.  Notably, the list includes orders that were active as long as ***sixty seconds*** before they were canceled.  In fact, for the 969 listed orders allegedly entered by Mr. Flotron, the average duration prior to cancelation was approximately 23 seconds.  ***Only three*** of Mr. Flotron's listed orders (*i.e.*, 0.3%) were active for less than two seconds.  In contrast, Coscia's illegal spoofing trades automatically canceled within milliseconds, and over 99.4% of them were cancelled in less than one second.  *Coscia*, 866 F.3d at 796.

milliseconds." *Coscia*, 866 F.3d at 786-87.  Only orders designed to be canceled faster than computer algorithms of counterparties in the market can consummate trades (*i.e.*, within milliseconds) can create the deceptive "illusion" that could establish a commodities fraud violation.  *See id.* at 797-98.

Unlike Coscia, Mr. Flotron did not implement programs or systems that preset orders, at the time of placement, to automatically cancel under any circumstance.  Mr. Flotron's orders were valid orders that were available to be accepted by any market participant who chose to do so.  Any shift in demand created by Mr. Flotron's bids and offers was consequently a real, bona fide shift in demand.[3]  Mr. Flotron's subsequent choice to cancel certain of his trade orders that were not executed by counterparties after a period of time is legal and routine in the market.  As the *Coscia* court explained, what distinguishes legitimate trading strategies from unlawful spoofs is that illegal "orders were designed to *evade* execution."  *Id.* at 800 (emphasis in original); *see also id.* at 795 ("The fundamental difference is that legal trades are canceled only following a condition subsequent to placing the order, whereas orders placed in a spoofing scheme are never intended to be filled at all.").  No such orders are present here.

While the Indictment nebulously alleges that Mr. Flotron "canceled the Trick Orders in an effort to ensure that they would not be executed," it lacks any allegation that Mr. Flotron implemented any system or took any steps to evade execution of his orders.  Nor could it possibly include any such allegation, because as a manual trader – rather than a trader like Coscia, whose trading decisions were made and executed by a high-speed computer algorithm – when Mr. Flotron placed valid orders into the market that were active for multiple seconds, there

was nothing he could do to evade their execution by market participants. This deficiency is glaring, considering that, in every count of commodities fraud count charged against Coscia, the government alleged that he entered "orders that he caused to be programmed to quickly cancel in order to prevent other market participants from filling them." *See* Indictment at 9-13, *United States v. Coscia*, No. 14 Cr. 551 (N.D. Ill. Oct. 1, 2014). The Indictment against Mr. Flotron could not possibly make any such allegations because, unlike Coscia, Mr. Flotron never took steps to evade potential execution of his orders.

Accordingly, Mr. Flotron's trading activity described in the Indictment is not fraudulent as a matter of law and Counts One through Four should be dismissed.

## II.     THE COMMODITIES FRAUD AND SPOOFING CHARGES ARE UNCONSTITUTIONALLY VAGUE AS APPLIED TO MR. FLOTRON

To the extent that either the commodities fraud statute or the "anti-spoofing" provision of the CEA could be interpreted to capture Mr. Flotron's trading activity, they are unconstitutionally vague as applied. Title 18 U.S.C. § 1348 proscribes "scheme[s] or artifice[s] . . . to defraud" in connection with the purchase and sale of commodities. As described above, the federal courts interpret this statute to capture deceptive and artificially manipulative conduct, not conduct premised entirely on permissible, legitimate market orders. As for the "anti-spoofing" provision of the CEA, it was hastily added to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") shortly before its passage, with virtually no legislative discussion. Its inherently vague language, if read literally, would capture huge swaths of legitimate market activity, and it falls far short of providing the definiteness

---

[3] *Even if* shifting the market price were Mr. Flotron's intent, which the defense contests, that alone is not sufficient to establish commodities fraud. *See Radley*, 659 F. Supp. 2d at 816 ("Acting in a manner that shifts the price of a commodity in a favorable direction is the business of profit-making enterprises, and if it is done without fraud or misrepresentation, it does not clearly violate the CEA").

required of criminal statutes to allow ordinary people to know what conduct it prohibits. Accordingly, these statutes are unconstitutionally vague as applied to Mr. Flotron, and each and every count of the Indictment must be dismissed.

### A.    Relevant Law

An indictment violates due process and must be dismissed if it is premised upon an unconstitutionally vague statute.  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Arriaga v. Mukasey*, 521 F.3d 219, 222 (2d Cir. 2008) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108, (1972)).   The "void for vagueness" doctrine is chiefly applied to criminal legislation, and "requires that a penal statute define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement."  *Id.* (quoting *Kolender v. Lawson,* 461 U.S. 352, 357 (1983)); *accord Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir. 1999).  The "touchstone" of the notice prong "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (quoting *United States v. Lanier*, 520 U.S. 259, 267 (1997)).  To satisfy the requirements of due process, a criminal statute must therefore include "ascertainable standards of guilt" such that people "of common intelligence [are not] required to guess at the meaning of the enactment."  *Winters v. New York*, 333 U.S. 507, 515 (1948).  The "standards of certainty" in statutes that provide for criminal punishment are "higher than in those depending primarily upon civil sanction for enforcement."  *Id*.

When these legal principles are applied to the commodities fraud statute and the CEA's anti-spoofing provision, it is clear that these provisions are unconstitutionally vague as applied to Mr. Flotron's conduct.

**B.     The Commodities Fraud Statute Is Void for Vagueness as Applied to Mr. Flotron**

Title 18 U.S.C. § 1348 proscribes only "scheme[s] or artifice[s] . . . to defraud" and the use "false or fraudulent pretenses" in connection with the purchase and sale of commodities.  As described in detail above, federal courts have repeatedly interpreted this statute and similar federal fraud statutes to capture only deceptive and artificially manipulative market conduct, not conduct premised entirely on permissible, legitimate orders.  Mr. Flotron is the first trader who manually entered his orders and manually canceled those orders to be indicted for commodities fraud based on alleged spoofing.  Until the government charged Mr. Flotron, only Coscia, an algorithmic trader who programmed a computer to cancel trades, had been charged for spoofing activity.  Trying Mr. Flotron for commodities fraud would require this Court to expand the purview of the statute well beyond the expectation of any reasonable and ordinary trader in Mr. Flotron's position.  Consequently, Counts One through Four of the Indictment should also be dismissed as void for vagueness to the extent they could arguably prohibit the conduct alleged in the Indictment.

**C.     The Anti-Spoofing Provision Is Void for Vagueness as Applied to Mr. Flotron**

The spoofing charges must be also dismissed because they are premised on a statutory provision that is unconstitutionally vague, particularly as applied to Mr. Flotron's alleged conduct.  The CEA prohibits so-called "disruptive practices," including "any trading, practice, or conduct that . . . is, is of the character of, or is commonly known to the trade as, 'spoofing'

(bidding or offering with the intent to cancel the bid or offer before execution)."  7 U.S.C. § 6c(a)(5)(C).  A knowing violation of Section 6c is a felony, punishable by up to 10 years in prison.  7 U.S.C. § 13(a)(2).  This prohibition is fraught with vagueness, as evidenced not only by the imprecise language of the statute itself, but by the muddled history of the provision and the CFTC's subsequent failed rulemaking attempt.

> 1.    The Origin of the "Anti-Spoofing" Provision

Congress passed Dodd-Frank in July 2010.  This statute, among other things, amended the CEA to add the "anti-spoofing" provision.  This provision lacks any apparent legislative history:  there were no committee reports, no testimony by any witnesses, and no discussion during congressional floor debates.  *See Coscia*, 866 F.3d at 787 n.7.  The sole reference to it is a single statement from one senator: "The CFTC requested, and received, enforcement authority with respect to insider trading, restitution authority, and disruptive trading practices."  *Id.* (citing 156 Cong. Rec. S5922 (2010)).

> 2.    The CFTC's Rulemaking Process

After the passage of Dodd-Frank, the CFTC and market participants both recognized that the scope and meaning of the "anti-spoofing" provision were unclear.  While the clause includes a brief parenthetical next to the term "spoofing" – *i.e.*, "bidding or offering with the intent to cancel the bid or offer before execution" – this language, if taken literally, would capture vast amounts of legitimate and normal trading activity that could not be considered criminal, or the type of conduct intended to be encompassed by the statute.  That is because cancellation of orders, particularly in the futures market, is entirely permissible and routine.  *See* Patterson, *supra*; Schapiro, *supra*.  Thus, traders frequently place orders into the market with the expectation that they may be canceled if no counterparty chooses to execute against them.

Acknowledging the vagueness of the statute, in November 2010, the CFTC sought public comment on the disruptive practices provisions. *See* 75 Fed. Reg. 67,301 (Nov. 2, 2010). The questions asked by the CFTC illustrate the vagueness of the definition of "spoofing" set forth in the statute:

- "Are there ways to more clearly distinguish the practice of spoofing from the submission, modification, and cancelation of orders that may occur in the normal course of business?" 75 Fed. Reg. at 67,302 (No. 11).

- "How should the Commission distinguish 'spoofing,' . . . from legitimate trading activity where an individual enters an order larger than necessary with the intention to cancel part of the order to ensure that his or her order is filled?" 75 Fed. Reg. at 67,302 (No. 8).

- "Should the Commission separately specify and prohibit [certain practices as distinct from spoofing, including] [s]ubmitting or cancelling multiple bids or offers to cause a material price movement[?]" 75 Fed. Reg. at 67,302 (No. 9).

These questions, in and of themselves, indicate the substantial uncertainty surrounding the scope of the anti-spoofing statute at the time of its passage, even within the CFTC, the chief regulatory agency charged with enforcing it.

In December 2010, the CFTC held a roundtable, in which several market professionals confirmed that "spoofing" had no accepted meaning, particularly in the futures market:

- Adam Nunes, Hudson River Trading Group (a prominent algorithmic trading firm): "[T]here's a fundamental question which is, if you're putting orders out that are taking risk, can you be defined as spoofing?" CFTC Staff Roundtable on Disruptive Trading Practices (Dec. 2, 2010) at 111:16-18;

- Gregory Mocek, former CFTC Director of Enforcement on behalf of the Commodity Markets Council (a trade association for commodity futures exchanges and industry members): "I'm not quite sure I know what spoofing is." *Id.* at 171:10-11;

- Kenneth Raisler, former General Counsel of the CFTC on behalf of the Futures Industry Association ("FIA") (a global trade organization for futures, options and cleared swaps markets): "[It is h]ard to imagine how [spoofing] even applies to the futures world or how it should be applied." *Id.* at 176:21-77:1.

19

The CFTC also received written comments from industry members confirming that "spoofing" was a vague term that had no accepted meaning in the futures markets.  For example, the FIA, the most prominent trade organization for the futures market, expressed concern that Section 6c(a)(5) was "an overly vague provision that is not clearly defined and prohibits activities that are also not subject to clear definition" and that "[t]he term 'spoofing' is not one that has been commonly used in the futures and derivatives markets and there is no generally understood or accepted meaning of the term in this context, or of the conduct that would be prohibited by reference to this term."  Letter from John M. Damgard, President of the FIA, at 1, 6 (Dec. 23, 2010).

Even CME Group – the operator of COMEX, the exchange on which Mr. Flotron traded metals futures – stated that "[t]he statute's definition of 'spoofing' . . . is too broad and does not differentiate legitimate market conduct from manipulative conduct that should be prohibited." Letter from Craig S. Donohue, Chief Executive Officer of CME Group, at 8 (Jan. 3, 2011).

         3.     *The CFTC's Proposed Interpretive Order*

Given this confusion, the CFTC abandoned its rulemaking efforts and decided instead to prepare only an "interpretive order" regarding the disruptive practices provision.  In February 2011, the CFTC held an open meeting to discuss this proposed interpretive order.  *See* CFTC Open Meeting on the Twelfth Series of Proposed Rulemakings Under the Dodd-Frank Act (Feb. 24, 2011).  At this meeting, multiple CFTC Commissioners acknowledged the vagueness of the disruptive trading provisions.  Commissioner Jill Sommers stated:  "When the draft language of [the provision] was first discussed among Commission staff, it was my view and the view of others [at the CFTC] that the language was too vague."  *Id*. at 12:17-21; *see also id*. at 13:12-14 ("[The] [d]isruptive trading practices statutory language is vague and this proposal does not cure

that vagueness."). Commissioner Scott O'Malia also acknowledged that "[t]he admittedly vague statutory prohibitions have presented some tough issues and we have spent long hours debating the appropriate course of action." *Id*. at 23:7-10.

The CFTC issued a *proposed* interpretive order in March 2011. *See* 76 Fed. Reg. 14,943 (March 18, 2011). This proposed order was tentative and non-binding. *See* CFTC Q&A – Proposed Interpretive Order on Disruptive Trading Practices, available at http://www.cftc.gov/idc/groups/public/@newsroom/documents/file/pidtp_qa.pdf (last visited Feb. 2, 2018) ("The Proposed Interpretive Order is a proposal — it does not bind the Commission or the public."). But even in this preliminary interpretive order, the CFTC provided only loose guidance as to the scope of the spoofing provision, stating that "if a person's intent when placing a bid or offer was to cancel the entire bid or offer prior to execution, regardless of whether such bid or offer was subsequently filled, that conduct ***may*** violate section 4c(a)(5)(C)." *Id*. at 14,947 (emphasis added). The CFTC added that "under this interpretation, section 4c(a)(5)(C) will not capture legitimate trading." *Id*.

It was not until May 2013 that the CFTC issued final interpretive guidance. This "interpretive guidance and policy statement" stated that "a spoofing violation will not occur when the person's intent when cancelling a bid or offer before execution was . . . as part of a legitimate, good-faith attempt to consummate a trade." 78 Fed. Reg. 31,890 at 31,896 (May 28, 2013). "When distinguishing between legitimate trading (such as trading involving partial executions) and 'spoofing,'" the CFTC explained that it would "evaluate the market context, the person's pattern of trading activity (including fill characteristics), and other relevant facts and circumstances." *Id*.

### 4.     CME Group's Anti-Spoofing Rules

It was not until even later, after the alleged conspiracy period in the Indictment – August 2014 – that CME Group published its own anti-spoofing rule.  The CME Group rule largely tracks the terms of the statute but – again illustrating the vagueness of the statutory definition – it identified a number of activities ostensibly covered by the rule that are nonetheless deemed legitimate.  *See* CME Group RA 1405-5, at 5 (Aug. 28, 2014), *available at* http://www.cmegroup.com/tools-information/lookups/advisories/market-regulation/files/RA1405-5.pdf ("Market participants may enter stop orders as a means of minimizing potential losses with the hope that the order will not be triggered . . . .  Such an order entry is not prohibited by this Rule."); *id*. ("It is understood that market participants may want to achieve queue position at certain price levels and, given changing market conditions, may wish to modify or cancel those orders.  In the absence of other indicia that the orders were entered for disruptive purposes, they would not constitute a violation of Rule 575.").

### 5.     The "Anti-Spoofing" Provision Does Not Provide Fair Notice of What Trading Activity Constitutes Spoofing

Given this background, it is clear that the "anti-spoofing" provision of the CEA does not offer a reasonably ascertainable standard for separating the permissible from the impermissible, particularly as applied to Mr. Flotron's manual trading activity.  Section 6c(a)(5)(C) defines spoofing as "bidding or offering with the intent to cancel the bid or offer before execution."  That definition is inherently vague.  If read literally, it would encompass legitimate trading activity and does not comport with any commonly accepted meaning of "spoofing" in the futures market.  Indeed, as the CFTC's haphazard rulemaking process made clear, there simply is no common understanding of spoofing in futures markets because the term has not previously been applied in such markets.

The only court to reject an as-applied vagueness challenge to the spoofing statute did so in completely different factual circumstances, and its reasoning suggests that Mr. Flotron's challenge should be successful.  In *Coscia*, the Seventh Circuit explained that a defendant challenging the statute's vagueness "must prove that *his* prosecution arose from arbitrary enforcement," rather than any "hypothetical" arbitrary enforcement in different circumstances under the spoofing statute.  866 F.3d at 794 (emphasis in original).  Finding that Coscia's "conduct falls well within the provision's prohibited conduct [because] he commissioned a program designed to pump or deflate the market through the use of large orders that were *specifically designed* to be cancelled if they ever risked actually being filled," the court denied his as-applied vagueness challenge.  *Id.* (emphasis in original).  This is consistent with Second Circuit law holding that the court's inquiry involves "determining whether the conduct at issue falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer could doubt the law's application in the circumstances."  *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006); *see also Smith v. Goguen*, 415 U.S. 566, 577-78 (1974) (noting that "there are statutes that by their terms . . . apply without question to certain activities but whose application to other behavior is uncertain," and that such a statute may not be vague as applied to "hard-core violator[s] . . . whatever its implications for those engaged in different conduct").

Mr. Flotron's as-applied challenge should succeed because the spoofing statute's "intent to cancel the bid or offer before execution" clause is impossibly vague regarding alleged conduct like Mr. Flotron's.  Unlike Coscia's orders, which were pre-programmed to automatically cancel before execution, Mr. Flotron's orders were valid, bona fide orders that were active on COMEX for far longer – thousands of times longer – than was necessary for them to be executed by other

market participants.  Mr. Flotron's orders were only ever canceled as separate and independent events, several seconds (or more) after they were entered.  Only bids or offers placed with the pre-determined intent and design "at the time they were placed," *Coscia*, 866 F.3d at 794, are within the core of conduct that could be viewed as illegal spoofing under the statutory definition. Coscia's orders were placed by super-fast computers designed to flash bids or offers and cancel them within milliseconds, thereby seeking to evade execution.  There is no allegation that Mr. Flotron did anything to evade execution at the time he placed his trade orders.  He merely canceled certain legitimate orders after they had been valid in the market for significant periods of time – more than long enough to be traded against – like every trader does.  Accordingly, the spoofing statute is unconstitutionally vague as applied to Mr. Flotron's conduct alleged in the Indictment.

The inadequacy of the "intent to cancel" standard is further illustrated by the fact that, as discussed above, the vast majority of orders entered in electronic futures markets are canceled prior to execution.  Permitting government agencies and prosecutors to select, without statutory guidance, which of these canceled orders to treat as crimes "delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis."  *Grayned*, 408 U.S. at 108-09.

> 6.    *CFTC's Subsequent Interpretive Guidance Does Not Cure the Vagueness As Applied to Mr. Flotron's Trading Activity*

The CFTC's interpretive guidance does not rectify the vagueness of the anti-spoofing provision, particularly as applied to Mr. Flotron's trading.

First, it is settled law that an administrative interpretation can clarify an otherwise vague statute only with respect to conduct that occurs after the interpretation is issued.  An agency's "order cannot retroactively give adequate warning of the boundary between the permissible and

impermissible applications of the law." *City of Chicago v. Morales*, 527 U.S. 41, 59 (1999). The relevant inquiry is thus "whether the statute, either standing alone or as construed, made it reasonably clear *at the relevant time* that the defendant's conduct was criminal." *United States* v. *Lanier*, 520 U.S. 259, 267 (1997) (emphasis added). If a statute does not provide adequate notice at the time of the defendant's conduct, an agency's after-the-fact clarification does nothing to cure the lack of fair warning as to what the law prohibited. *See, e.g.*, *Lanzetta* v. *New Jersey*, 306 U.S. 451, 456 (1939) ("Appellants were convicted before the opinion in *State* v. *Gaynor*. It would be hard to hold that, in advance of judicial utterance upon the subject, they were bound to understand the challenged provision according to the language later used by the court."). At the time of Mr. Flotron's alleged conduct, the CFTC had not provided any guidance that his actions could be considered spoofing, much less the adequate notice required by the law.

As described above, the CFTC did not provide even a non-binding, final interpretative order regarding the anti-spoofing provision until May 2013. This postdates the orders forming the basis of Count Five and Count Six of the Indictment. *See* Indictment ¶ 25 (charging Mr. Flotron with spoofing on June 28, 2012 (Count Five) and February 15, 2013 (Count Six)). Thus, the CFTC's guidance cannot cure the vagueness problems described above as to Count Five or Count Six. *See Morales*, 527 U.S. at 59.

Regardless, as to all three counts of spoofing charged against Mr. Flotron, the final CFTC guidance does not make clear to a reasonable market participant in Mr. Flotron's position that the charged conduct would be considered illegal. This guidance concedes that "spoofing" does not mean all "bidding or offering with the intent to cancel the bid or offer before execution." 7 U.S.C. § 6c(a)(5)(C). Instead, the inquiry will be highly fact-intensive: "[w]hen distinguishing between legitimate trading (such as trading involving partial executions) and 'spoofing,'" the

CFTC explained that it would "evaluate the market context, the person's pattern of trading activity (including fill characteristics), and other relevant facts and circumstances." 78 Fed. Reg. at 31,896.

As described above, Mr. Flotron's alleged conduct was comprised of nothing more than manually placing orders on COMEX, and then manually cancelling some of those orders prior to execution. All of these orders were legitimate and were active in the market for amply sufficient time to be accepted by other market participants. Mr. Flotron never employed any algorithms or other systems to ensure that these orders were canceled prior to execution, and he and UBS always fulfilled their contractual obligations in regard to any completed executions. Thus, Mr. Flotron had no reasonable basis to believe that his trading activity could possibly subject him to criminal liability for violating the CEA. Consequently, all spoofing charges against him should be dismissed.

## III.    PREJUDICIAL SURPLUSAGE SHOULD BE STRICKEN FROM THE INDICTMENT

To the extent any of the Counts of the Indictment are not dismissed, Mr. Flotron moves in the alternative, pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure, to strike surplus and prejudicial language from the Indictment. The Indictment contains several inflammatory, irrelevant, and prejudicial statements that should be stricken. *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (Motions to strike surplusage from an indictment will be granted where the challenged allegations are "not relevant to the crime charged and are inflammatory and prejudicial."); *see also United States v. Greebel*, No. 15 Cr. 637 (KAM), 2017 WL 3610570, at *2 (E.D.N.Y. Aug. 4, 2017) (striking surplusage when the government's confusing allegations had a tendency to enlarge charges against the accused).

*First*, the government's use of the terms "Trick Order" and "Genuine Order" to refer to orders placed by Mr. Flotron is inflammatory and has no probative value.  It is the government's burden to prove, as an element of its commodities fraud and spoofing charges respectively, that certain orders placed by Mr. Flotron were fraudulent or violated the CEA's anti-spoofing provision.  Using the term "Trick Orders" pre-supposes the conclusion that Mr. Flotron's orders were somehow fraudulent or improper.  There is absolutely no relevance to the use of such terms, as they are not allegations of fact, but are merely crafted to prejudice the jury and aid the government.  It is the jury that must determine the intent behind the orders, not the stylings of the government.  Thus, these terms are prejudicial to Mr. Flotron, and would unfairly influence the jury's factual determination of whether certain orders were actually "tricks," or were in fact legitimate, bona fide orders.

Courts have held that when words employed in an indictment are "unnecessarily loaded," they should be stricken as prejudicial surplusage.  For example, in a case involving a conspiracy to steal government documents, the District Court for the District of Columbia held that the term "bogus" was a loaded term that should be stricken as surplusage.  *United States v. Hubbard*, 474 F. Supp. 64, 83 (D.D.C. 1979).  The court held that "use of such colorful words to describe the allegations in the indictment is improper where less colorful and more accurate words would suffice."  *Id.*; *see also United States v. Espy*, 23 F. Supp. 2d 1, 11 (D.D.C. 1998) (referring to "prohibited sources" of income was prejudicial surplusage because the term suggested to jury that receipt of the income "constitute[d] criminal conduct before he has an opportunity to defend himself" and "[t]he adjective 'prohibited' imputes criminality on the part of the defendant prior to having any opportunity to present evidence to the contrary").

There are undoubtedly less prejudicial (and more factual) terms available to the government. For example, each of the government's alleged spoof episodes involves "Smaller Orders" and a "Larger Order," or alternatively, "Sell Orders" and a "Buy Order," or alternatively the numerical amounts of each order. Any of these factual sets of terms would sufficiently identify the orders at issue in the Indictment without prejudicially framing such orders to the jury as improper "tricks." Indeed, in other criminal actions brought by the government alleging spoofing conduct, the government used this type of less prejudicial language when presenting its allegations. *See, e.g.*, Crim. Compl., ¶¶ 21-53, *United States v. Zhao*, No. 18 Cr. 24 (N.D. Ill. Jan. 11, 2018) (Dkt. No. 1) (alleging that Zhao placed "Primary Orders" and "Opposite Orders" to spoof the E-Mini S&P 500 futures market).

*Second*, the government's inclusion of the "Approx. Value of Contracts Purchased" in Paragraph 23, and the "Approx. Total Value of the Order" in Paragraph 25 of the Indictment is misleading, irrelevant, and designed purely to inflame the jury. The total values of the orders that the government has alleged to be fraudulent spoof orders in Counts Five, Six, and Seven (which add up to over $45 million) are immaterial to any element of the charges against Mr. Flotron. These values have no relation to any alleged potential financial gain by UBS or Mr. Flotron resulting from these transactions, nor to any losses allegedly incurred by the counterparties.[4] The same irrelevance and prejudice is true of the total value of the orders filled by Mr. Flotron as a result of the alleged spoofing, as set forth in Counts Two, Three, and Four

---

[4] Regarding the alleged "value of contracts purchased" by Mr. Flotron in ¶ 23, these enormous dollar amounts are irrelevant to his profits. Even assuming, *arguendo*, that UBS's gain could be calculated by using the last completed transaction before Mr. Flotron entered the alleged spoof order versus the subsequent order Mr. Flotron executed, the most that UBS could arguably be said to have gained from all three trades alleged in the Indictment is $120. Similarly, regarding the "total value of [the alleged spoof] orders" in ¶ 25, the Government contends that the so-called "Trick Orders" were cancelled (*i.e.*, never executed), thus Mr. Flotron could not possibly have gained any portion of the approximately $45 million in total value identified in ¶ 25, nor could potential victims have lost any portion of that amount.

(which add up to over \$2.5 million).   Yet, that is exactly the (mis)impression given by the government's inclusion of these large numbers in the Indictment.   The only discernable reason for these trumped-up allegations is to advance a misleading impression that Mr. Flotron is somehow responsible for millions of dollars of illicit gains to UBS or losses to other counterparties.  *United States v. Lavin*, 504 F. Supp. 1356, 1363 (N.D. Ill. 1981) (holding that when an allegation "overstates the scope and the result of any alleged fraud" it might "inflame the sentiments of the jury" and must be stricken).

There is no basis for any allegation that these large figures relate to profit or loss.  Thus, these prejudicial and irrelevant values should be stricken from the Indictment.  *See United States v. Cooper*, 384 F. Supp. 2d 958, 959-61 (W.D. Va. 2005) (striking preamble to indictment as surplusage where defendant was accused of violating the Clean Water Act and preamble contained discussion of defendant's prior difficult dealings with environmental and health agencies); *United States v. Poindexter*, 725 F. Supp. 13, 35-36 (D.D.C. 1989) (finding term "cover up" should be stricken from indictment as inflammatory and unnecessary, and "among other things," "at least," "included, but not limited to," and "in part" should be stricken as they could indicate to jury that defendant was charged with offenses and conduct in addition to those actually listed in indictment); *United States v. Wilson*, 565 F. Supp. 1416 (S.D.N.Y. 1983) (striking as surplusage language of indictment alleging that defendant, at the time of the offenses in question, was incarcerated in lieu of \$20,000,000 bail and while serving a 15-year sentence).[5]

---

[5] Mr. Flotron has moved under separate cover to dismiss, with prejudice, Counts Two through Seven of the Indictment for lack of venue.  *See* Dkt. No. 64.

## **CONCLUSION**

For the reasons set forth above, the Indictment should dismissed with prejudice in its entirety or, in the alternative, the prejudicial surplusage should be stricken.

Respectfully submitted,

GREENBERG TRAURIG LLP

By: __/s/ Marc L. Mukasey__
    Marc L. Mukasey (ct29885)
    Nathan J. Muyskens
    Daniel E. Clarkson (ct30395)

    200 Park Avenue
    New York, New York 10166
    Telephone: (212) 801-9200
    Facsimile: (212) 801-6400
    *Attorneys for Defendant Andre Flotron*

**AFFIRMATION OF SERVICE**

I hereby certify that on February 6, 2018, a copy of the foregoing Memorandum of Law in Support of Defendant's Motion to Dismiss the Superseding Indictment or, in the Alternative, to Strike Prejudicial Surplusage was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
          February 6, 2018

                                                    /s/ Marc L. Mukasey
                                                    Marc L. Mukasey
                                                    200 Park Avenue
                                                    New York, New York 10166
                                                    Telephone: (212) 801-9200
                                                    Facsimile: (212) 801-6400
                                                    Email: mukaseym@gtlaw.com