UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:17CR220(JAM) |
| | : | |
| v. | : | |
| | : | |
| ANDRE FLOTRON | : | March 5, 2018 |

GOVERNMENT'S MOTION TO AMEND RULING (DOC. 81)

The Government respectfully moves the Court to amend its February 19, 2018 order dismissing counts two through seven of the Superseding Indictment without prejudice and denying leave of court for dismissal of count one of the superseding indictment (Doc. 81).  Specifically, the Government requests that the Court withdraw the portion of the order that finds the Government to have acted in bad faith in moving to dismiss count one of the superseding indictment. *See* Doc. 81 at 13-14.  The Government strongly believes that the prosecutors in this matter proceeded in good faith at every turn, consistent with the information then available, and in accordance with what justice demanded. The Government's motion to dismiss without prejudice was similarly motivated in good faith not to delay trial, but to see the interests of justice pursued in the most efficient manner.  The Government has consulted with counsel for the defendant, who consents to the relief sought in this motion and notes that he never argued that the Government acted in bad faith.

I.   **Relevant Background**

On September 12, 2017, defendant Andre Flotron was charged by complaint with conspiracy (in violation of 18 U.S.C. § 371), wire fraud (in violation of 18 U.S.C.

§ 1343), commodities fraud (in violation of 18 U.S.C. § 1348(1)), and spoofing (in violation of 7 U.S.C. §§ 6c(a)(5)(C) & 13(a)(2)). Doc. 1. The following day, he was arrested in New Jersey. On September 26, he was indicted by a Connecticut federal grand jury on one count of conspiracy to commit wire fraud, commodities fraud, and spoofing (in violation of 18 U.S.C. § 371). Docs. 5, 14. On October 5, defendant Flotron was arraigned, and jury selection was set for December 7. Docs. 25, 26.

The original indictment alleged venue for the charged conspiracy in Connecticut and elsewhere. *See* Doc. 14 at 4. Indeed, the conspiracy was initiated in or around 2008 when Flotron trained "UBS Trader 1" in spoofing, *see* Doc. 14 at 6, while both were located at UBS's offices in Stamford, Connecticut. In the weeks following Flotron's arrest and indictment, the Government explained to counsel and the Court that it intended to seek a superseding indictment that would add substantive counts of commodities fraud and spoofing that occurred during the course of the conspiracy. *See*, *e.g.*, Transcript of Hearing on October 5, 2017 ("Oct. 5 Tr.") at 6; Transcript of Hearing on November 6, 2017 ("Nov. 6 Tr.") at 9-10; Transcript of Hearing on December 4, 2017 ("Dec. 4 Tr.") at 4. At none of those times did the Government anticipate a lack of venue for the substantive counts, and thus did not alert the Court to any such issue.

On November 6, 2017, a hearing was held to discuss, among other things, the setting of a trial date. The Government requested a date in July to accommodate discovery as well as the lead prosecutor's April trial in another case. The defense requested a trial in April, May or June. Among other things, the Government argued

that the lead prosecutor's experience with this and other spoofing cases for over a year could result in a smoother and more efficient trial, and that the Government had an interest (recognized in the statute) in continuity of counsel.  Nov. 6 Tr. at 15-16. On November 7, 2017, the Court issued an order that called for jury selection on April 6, 2018.  On December 1, 2017, a new lead prosecutor filed an appearance for the Government. Doc. 41.  The prior lead prosecutor disengaged from active involvement in this matter because the Government fully expected trial to occur in April 2018, when he will be otherwise engaged.

On December 4, 2017, a status hearing was held to discuss scheduling of pre-trial deadlines.  Among other things, a schedule was set for disclosure of certain sets of transactions, including (1) disclosure by December 14 of approximately 1,000 transactions related to the conspiracy and (2) disclosure by December 29 of a list of approximately 25 spoof/primary-order transactions that the government believes are most likely to be the focus of any superseding indictment and trial evidence.  *See* Doc. 45.  New lead counsel repeated the Government's prior representation to the Court that the Government would supersede the indictment by the end of January, and the Court set deadlines for motions and other filings accordingly.  Dec. 4 Tr. at 23.  New lead counsel and counsel from the Department of Justice's Fraud Section also explained to the Court the massive amounts of data that had already been culled through and that would continue to be culled through to reach the universe of spoofing episodes that would be presented at trial, either in summary form or by way

of more detailed examples. Again, the Government still expected to have venue over substantive counts.[1]

On January 30, 2018, a Connecticut federal grand jury returned a superseding indictment charging the defendant with conspiracy to commit commodities fraud, in violation of 18 U.S.C. § 1349 (Count 1) and three counts each of substantive commodities fraud, in violation of 18 U.S.C. §§ 1348 and 2 (Counts 2–4), and spoofing, in violation of 7 U.S.C. §§ 6c(a)(5)(C) and 13(a)(2) and 18 U.S.C. § 2 (Counts 5–7). The substance of the scheme alleged in the conspiracy count did not change in a meaningful way, although the objects were narrowed to only commodities fraud, for reasons the Government explained to the Court. Transcript of Hearing on February 15, 2018 ("Feb. 15 Tr.") at 40. The conspiracy continued to be venued in Connecticut and elsewhere. The new substantive counts of commodities fraud and spoofing, which were (as promised) part of the course of the conspiracy, were explicitly venued in the Northern District of Illinois.

As counsel explained to the Court, the lack of venue over substantive counts was not determined until very close to the date of the superseding indictment. Feb. 15 Tr. at 34. At the same time, the Government explained that it had a strong interest in charging those substantive violations of the spoofing statute because the

---

[1] The Government has previously explained that the reason it moved forward with a complaint and arrest warrant in September 2017 was the defendant's presence in the United States at that time. Oct. 5 Tr. at 6. The defendant is a national of Switzerland, which does not extradite its own citizens. While the Government was fully prepared to move forward on the conspiracy indictment at that time, it had not yet completed the massive data review necessary to file substantive counts. Indeed, until the defendant appeared unexpectedly in the United States, the Government had anticipated charging him with both the conspiracy and substantive counts on a schedule consistent with its broader spoofing enforcement efforts, involving arrests of several other commodities traders in January 2018.

elements of that crime were different from those required for commodities fraud.  Feb. 15 Tr. at 41-42.  Rather than immediately charging those counts in Chicago, which would result in two trials—an outcome in which nobody had an interest, but which the Court noted was perfectly permissible, *see id*. at 8—the United States Attorney's office and the Fraud Section instead made a decision to explicitly venue the case in the Northern District of Illinois, and to alert the defendant to the issue so that he could either assert his venue rights or waive them.  *See id*. at 32-33.  The Government believed that this was the most likely way to permit the trial to proceed on schedule in Connecticut (if the defendant waived) or as quickly as possible after that (if he did not).

The defendant moved to dismiss Counts 2-7 with prejudice on venue grounds. Doc. 64.  The Government conceded that Counts 2-7 should be dismissed, but argued it should be without prejudice to permit re-presentation elsewhere, and also requested that, if the Court dismissed Counts 2-7 without prejudice, Count 1 also be dismissed to avoid the inefficiency of two trials in two different venues.  Doc. 71.  The Court dismissed Counts 2-7 without prejudice, but denied the Government's motion to dismiss Count 1 without prejudice, finding that it was not in the public interest "to allow the Government at this late date to abandon its case in Connecticut so that it may reload and re-file against defendant in Chicago."  Doc. 81 at 13.  Although the Court held that the standard did not require a finding of bad faith, and noted that there was an insufficient record to assess the prosecutors' motivations, it nonetheless

5

found that the Government had acted in bad faith by manipulating the charging process in order to go back on its word to try this matter in April. *Id*. at 14-15.

## II.   Legal Standard

Rule 48(a) provides that, "[t]he Attorney General or the United States attorney may by leave of court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate."  Fed. R. Crim. P. 48(a).  Although the Rule requires "leave of the court," a "court is generally required to grant a prosecutor's Rule 48(a) motion unless dismissal is 'clearly contrary to manifest public interest.'" *United States v. Pimentel*, 932 F.2d 1029, 1033 n.5 (2d Cir. 1991) (quoting *United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975)); *see also United States v. Carrigan*, 778 F.2d 1454, 1463 (10th Cir. 1985) (citing *Cowan*); *United States v. Miller*, 722 F.2d 562, 566 (9th Cir. 1983).

## III.   The Court Should Amend Its Order to Withdraw the Bad Faith Finding

The Government respectfully requests that the Court withdraw its bad faith finding for two essential reasons: First, the Court's ruling denying dismissal of count one was not based on a finding of bad faith, and therefore the Court need not have reached the issue.  Neither party demanded that the Court reach the issue of bad faith, and the Government simply answered the inquiries put to it by the Court. Second, the factual record before the Court is insufficient to make a finding of bad faith, and the evidence that does exist does not support such a finding.

### A.  The Court Need Not Reach Bad Faith

The Court denied the Government's motion to dismiss count one of the superseding indictment as "contrary to the manifest public interest," and without reference to the question of whether the Government had acted in bad faith.  Doc. 81 at 13.  The Court then suggested that the Government "implore[d]" the Court to decide if it acted in bad faith, even though the Court did not believe it to be a necessary part of the standard.  *Id*.

The Government certainly did not intend to suggest that the Court *must* look at bad faith if it can otherwise decide the issue.  Rather, the Government filed a letter that it believed addressed a question it could not answer during the hearing, namely, whether the Court had discretion to decline a motion to dismiss under Rule 48(a) "in light of the very concerns pointed out by the Supreme Court in [*Rinaldi v. United States*, 434 U.S. 22 (1977)] and other cases."  Feb. 15 Tr. at 37 ("[The Government]:  I don't know the answer whether this would be within your discretion.").

While the Rule 48(a) standard looks to whether the dismissal was "clearly contrary to manifest public interest," *Pimentel*, 932 F.2d at 1033 n.5 (citations omitted), *Rinaldi* very clearly suggests that bad faith can be a component of that analysis.  *See* 434 U.S. at 30 ("The salient issue, however, is not whether the decision to maintain the federal prosecution was made in bad faith but rather whether the Government's later efforts to terminate the prosecution were similarly tainted with impropriety.").  This was consistent with other cases identified by both the defendant and the Government, which considered either whether there was harassment of the

defendant or bad faith by the prosecutor.  *See* Doc. 65 at 7; Doc. 78 at 1-2.  While the defendant advanced only a harassment claim, the Government briefly addressed the evidence as to both harassment and bad faith since the Court had inquired more generally about its discretion, and specifically referenced *Rinaldi*.  In other words, the Government believed itself to be responsive to the Court, but did not intend to suggest that the Court was required to make a finding on bad faith in order to rule on the Government's motion.

In short, the Court need not have reached the issue of bad faith here since it decided the issue based on manifest public interest.[2]

## B. There Is An Insufficient Factual Record to Conclude That Bad Faith Existed

The Court's conclusion, that the Government's motion to dismiss was a pretextual manipulation to move the trial date and to break a promise to proceed to trial in April, is an unfair attack on the professionalism and integrity of the prosecutors in this matter.  Doc. 81 at 14.  As the Court rightly pointed out in its Order, there is an insufficient record in this case to assess the motivations of the prosecutors in moving to dismiss this case.  *See* Doc. 81 at 14-15.  Generally, in deciding a Rule 48(a) motion, there is a "presumption of good faith on the part of the prosecutor absent evidence to the contrary." *United States v. Rosenberg*, 108 F. Supp. 2d 191, 203 (S.D.N.Y. 2000).  On this record, the Government respectfully submits

---

[2] The Court also suggests it reached bad faith in the event the Government took an interlocutory appeal.  Because the Court's decision to deny the Government's motion to dismiss is not appealable, the Court's findings were unnecessary on that score as well.  *See* 18 U.S.C. § 3731 (limiting grounds for appeal by the Government).

that there is insufficient evidence to overcome that presumption, and that limited evidence that does exist demonstrates that the prosecutors were acting in a professional, upright manner.

First, the Court's conclusion that the Government's motion was an attempt to engineer a trial delay is not reflected in the rest of the Government's performance in this case. The Government has been diligently and without complaint preparing for trial on the schedule set by the Court. It has never asked for a continuance and never asked for reconsideration of the Court's scheduling order, even though it sidelined the lead prosecutor from this case. It has met all disclosure deadlines imposed by the Court. Even now, after the Court denied the Government's motion, the Government has provided the defendant with its witness and exhibit lists in accordance with the trial schedule and fully plans to proceed as instructed by the Court.

Second, even when the Government concluded that it did not have substantive counts to venue in Connecticut, it did not simply seek an indictment in Chicago, which would have been its prerogative. Rather, it pursued a path that it believed, in good faith, could still provide the defendant with a single trial of all related crimes on the existing schedule. If the Government, as the Court suggests, was attempting to delay trial on those substantive counts, it could have simply indicted the defendant in Chicago and proceeded to trial there at some later date.

Third, in suggesting that the Government should have simply walked away from substantive charges, the Court overlooks the significant interest the Government and the public have in trying to add substantive spoofing counts to the

indictment.   The Court unfairly accuses the Government of simply wishing to "decorate its broad conspiracy charge with baubles of substantive charges that serve little or no function other than to run up defendant's sentencing exposure."  Doc. 81 at 11.  As the Government attempted to explain at the February hearing, this is not a case where the substantive spoofing counts mirror the conspiracy.  Feb. 15 Tr. at 40.  Commodities fraud (the object of the conspiracy count) and spoofing are different offenses, covered by different statutes that have different elements.   Under the spoofing statute, the Government need only prove that the defendant engaged in "bidding or offering with the intent to cancel the bid or offer before execution."  7 U.S.C. § 6c(a)(5)(C).  In contrast, commodities fraud under 18 U.S.C. § 1348 requires proof of intent to defraud.  Thus, the Government's interest in including substantive spoofing charges was not to increase the defendant's maximum statutory sentence, but to charge the most readily provable offenses, including one that did not require proof of fraudulent intent.

Fourth, the Court incorrectly concludes that the Government knew all along that it did not have venue in Connecticut.  *See* Doc. 81 at 9.  The Court rests its conclusion on one fact that was well known to the Government at the inception of this investigation, that is, that Flotron left Connecticut in 2009.  *Id*.  Yet the Government clearly never intended to rest venue for substantive counts on Flotron's physical location.   Rather, the Government labored under the honest, but mistaken, understanding that venue would lie in Connecticut for substantive counts for two principal reasons:  UBS's U.S. futures trading operation (along with its computers)

was solely located in Connecticut, and there were several trading counterparties located in Connecticut.  It was only as the Government assembled the substantive counts for the superseding indictment that the Government realized that its understanding was mistaken, and that venue may not lie in Connecticut for substantive charges.  This conclusion required months of review of complex and voluminous data encompassing hundreds of thousands of transactions, as well as interviews in January 2018 with UBS personnel and with Connecticut counterparties concerning transactions that had been identified in that analysis as spoofing.  Right up until shortly before the superseding indictment, the Government still believed it would have venue in Connecticut.

In short, the Court unfairly accuses the Government of "dodg[ing]" the Court's inquiries about potential surprises in the superseding indictment, suggesting that the Government was stringing the Court and defense along until it could spring the mis-venued counts when it was too late for anyone to do anything about it.  Doc. 81 at 9.  Nothing could be further from the truth—the Government's only interest here was to try the entire case, including both conspiracy and substantive counts, on the schedule set by the Court.  If (as the Court suggests) the Government had known about the venue problem all along, it could have early on moved to have the entire case transferred to Chicago, where the commodities exchange is located and where there is already strong case law on spoofing.  *See United States v. Coscia* 866 F.3d 782 (7th Cir. 2017).

IV. __Conclusion__

In sum, the Government respectfully requests that the Court withdraw the bad faith finding from its February 19, 2018 order. As discussed above, it is an unnecessary and unwarranted attack on the professionalism of the lawyers prosecuting this case and the offices for which they work. Moreover, the defendant has never claimed bad faith by the Government, and consents to the relief sought here. The Government has heeded the Court's orders, and will be prepared for an April 6, 2018 trial.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/ *David E. Novick*

DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY
United States Attorney's Office
157 Church Street, 25th Floor
New Haven, CT 06510
(203) 821-3700 (telephone)
david.novick@usdoj.gov
Federal Bar No. phv02874

<u>CERTIFICATE OF SERVICE</u>

   This is to certify that on March 5, 2018  a copy of the foregoing pleading was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

      /s/ *David E. Novick*

      DAVID E. NOVICK
      ASSISTANT UNITED STATES ATTORNEY