UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | S1 17 Cr. 220 (JAM) |
| v. | March 5, 2018 |
| ANDRE FLOTRON, | ORAL ARGUMENT REQUESTED |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO
PRECLUDE EVIDENCE RELATING TO
TRADING ACTIVITY NOT TIMELY DISCLOSED**

This motion to preclude evidence is based on the government's flagrant violation of this Court's December 6, 2017 Scheduling Order.  That Order required the government to notify the defense, by December 29, 2017, of "the 25 spoof/primary-order transactions that the Government believes are most likely to be the focus of any superseding indictment *and trial evidence.*"  ECF No. 45 (emphasis added).  The government violated this Scheduling Order by marking as trial exhibits seventeen trade sequences that were not included on its "Top 25 List," never previously identified to the defense, and in some cases, not even disclosed on the larger list of 1,273 "Orders of Interest" that the government was required to produce last December.  Only four of the government's trade sequence trial exhibits were included in the Top 25 List.

In short, the government engaged in a classic bait and switch:  it gave the defense a Top 25 List with which to prepare, and then threw out that list and marked as trial exhibits seventeen new trade sequences that were not previously identified for the defense.  The net effect is that months of time and resources spent analyzing the trade sequences on the Top 25 List were wasted.  It will take weeks to analyze the new trade sequences and associated data.  The remedy

is clear:  those trade sequences marked as Government Exhibits that were not on the Top 25 List

should be precluded.[1]

### BACKGROUND

This is a data-driven and complex case.  From the outset, the defense has made clear that, in order to prepare for trial, it needed the government to identify those specific trade sequences that it would seek to introduce in evidence at trial as examples of "spoofing" – whether as substantive counts, scheme evidence, or acts in furtherance of the charged conspiracy. Accordingly, the Court's December 6th Order required the government to disclose, by December 14, 2017, "approximately 1000 transactions related to the alleged conspiracy" and to disclose by December 29, 2017, "the 25 spoof/primary-order transactions that the Government believes are most likely to be the focus of any superseding indictment *and trial evidence.*"  ECF No. 45 (emphasis added).  In accordance with the deadlines, the government timely produced a list of 1,273 Orders of Interest, and a Top 25 List of trade sequences that it would highlight at trial.

For the past two months, the defense has spent virtually all of its preparation time examining the trade sequences on the Top 25 List – each of which is linked to gigabytes of data. We have devoted hundreds of hours to reviewing the Top 25 List, and analyzing the data, FBI reports, emails, chats, and other documents relating to the trade sequences on the list.  Then came the trickery.

On March 2, 2018, at 11:45 p.m., the government filed its exhibit list (the "Exhibit List"). The defense expected the trade sequences listed as government exhibits to largely come from the Top 25, with perhaps a few additions or deletions.  Instead, the Exhibit List identified 21 trade

---

[1] Specifically, the Court should preclude the following government exhibits, as well as any evidence and testimony addressing the trade sequences to which they relate:  GX 101(a)-(b), GX 102-103, GX 106-107, GX 108-109, GX 112-113, GX 116-117, GX 118-119, GX 119(a), GX 119(b), GX 119(c), GX 119(d), GX 120, GX 121, GX 122, GX 123, GX 124, and GX 125.

sequences that the government expects to introduce at trial, only four of which were noticed on the government's Top 25 List.[2] *See* Exhibit List, ECF No. 95, at 4-5 (GX 100 – 125(a)). Seventeen of the trade sequences marked as exhibits were never before identified to the defense. And five of the Exhibit List trade sequences were not even on the government's larger list of 1,273 Orders of Interest.

Below is a summary of the new Exhibit List trade dates, including whether they were on the Top 25 List or the larger Orders of Interest list.

| Exh. No. | Date of Trade Sequence | Trader | Top 25 List | 1,273 Orders of Interest |
|---|---|---|---|---|
| GX 101(a)-(b) | April 5, 2011 | Flotron | No | Yes |
| GX 102-103 | May 8, 2012 | Flotron | No | Yes |
| GX 104-105 | June 28, 2012 | Flotron | Yes | Yes |
| GX 106-107 | August 7, 2012 | Flotron | No | Yes |
| GX 108-109 | January 21, 2013 | Flotron | No | Yes |
| GX 110-111 | February 15, 2013 | Flotron | Yes | Yes |
| GX 112-113 | September 17, 2013 | Flotron | No | Yes |
| GX 114-115 | September 30, 2013 | Flotron | Yes | Yes |
| GX 116-117 | February 28, 2010 | Chan | No | Yes |
| GX 118-119 | March 9, 2010 | Chan | No | Yes |
| GX 119(a) | April 13, 2010 | Chan | No | No |
| GX 119(b) | April 30, 2010 | Chan | No | No |
| GX 119(c) | January 7, 2011 | Chan | No | No |
| GX 119(d) | March 29, 2011 | Chan | No | No |
| GX 120 | May 31, 2012 | Chan | No | Yes |
| GX 121 | October 23, 2012 | Flotron | No | Yes |
| GX 122 | October 26, 2012 | Chan | No | Yes |
| GX 123 | November 26, 2012 | Flotron | No | No |
| GX 124 | June 3, 2008 | Flotron | No | Yes |
| GX 125 | June 6, 2008 | Flotron | No | Yes |
| GX 125(a) | March 4, 2013 | Flotron | Yes | Yes |

---

[2] In fact, the defense cannot even be fully sure at this time that these four trade sequences were included in the Top 25 List. That is because the Exhibit List identifies only the dates on which the trade sequences that the government will prove took place. The government has not yet identified which specific trade sequences it will focus on from among the thousands of orders that were entered on each of these dates. Until the defense receives this information, it cannot know with certainty that these four trade sequences were actually included on the Top 25 List.

On March 3, 2018, defense counsel contacted the latest members of the rotating team of government lawyers, to express surprise and concern that the Exhibit List identified seventeen trade sequences that would be "called out" or presented at trial, yet were not on the Top 25 List, and five that were not even among the 1,273 Orders of Interest.  In response, a Department of Justice lawyer new to the case and unknown to defense counsel took the curious position that the Top 25 List *did not* represent the group of trade sequences about which the government might present evidence at trial, but merely represented the 25 trade sequences from which the government could have picked substantive counts to charge.  According to the government, since it was no longer able to charge substantive counts due to lack of venue, the Top 25 List was rendered obsolete.  So, claimed the government, notwithstanding the Court's December 6th Order, the trade sequences to be introduced at trial could be a brand-new, surprise set (apparently, based on the Exhibit List, even including trade sequences culled from beyond the 1,273 Orders of Interest).  The government contends that dismissal of the substantive counts of the Superseding Indictment absolved it from abiding by the agreement it reached with the Court and the defense regarding the trial proof.

The defense vehemently disagrees with the government's characterization of what the Top 25 List represented.  The Top 25 List was never supposed to represent only those trade sequences that might be charged as substantive counts.  For starters, the Top 25 List identified not only trade sequences executed by the defendant, but also by Kar-Hoe ("Mike") Chan, the government's cooperating witness, who obviously was not going to be charged in the Superseding Indictment with substantive counts; he received a Non-Prosecution Agreement long before the Top 25 List was conceived or compiled.  That is proof positive that the Top 25 List

was not, as the government now contends, a list of trade sequences that might be the subject of substantive counts. Rather, it represented the trade sequences the government expected to highlight at trial, whether as scheme evidence, overt acts, substantive counts, or simply examples of "spoofing."

The record of pretrial conferences in this case is further proof that the Top 25 List was not simply a list of trade sequences from which the government would choose substantive counts, later rendered obsolete when the government determined it did not have venue for those counts. The colloquy at the conferences makes clear that the Top 25 List represented the trade sequences that the government would "call out" from the 1,273 Orders of Interest and prove at trial – whether as substantive counts, scheme evidence, or acts in furtherance of the charged conspiracy.[3]

For example, on October 5, 2017, at the first conference in this matter, the AUSA leading the prosecution team at the time engaged in the following colloquy with the Court:

> MR. FRANCIS: . . . At least our initial discovery, we have no problem providing it to them within two weeks and we'll get it to them sooner if we can.
>
> THE COURT: The initial discovery being the ones concerning the trades that you anticipate will be the subject of overt acts?
>
> MR. FRANCIS: That's right. That's right.

Oct. 5, 2017 Conference Tr. at 14:9-15.

---

[3] We understand that the government also will attempt to introduce, in summary or "omnibus" form, 538 Flotron trade sequences and 274 Chan trade sequences, which one government lawyer previously characterized as "potential spoofing." *See* Exhibit List at GX 126 – 127; Dec. 4 Conference Tr. at 13:8-14 ("[I]t's important to keep in mind that there will also be a charge under 18 U.S.C. Section 371 reflecting this larger conspiracy where there were hundreds of instances of *potential* spoofing activity. And what we're looking to turn over to the defense at a reasonable time so they can begin focusing on that is that larger pool.") (emphasis added). Which trade sequences are included in these two "omnibus" exhibits remains a mystery, as is the government's theory of admissibility. While we assume that these "omnibus" trade sequences are a subset of the 1,273 Orders of Interest, the government has not yet provided these summary exhibits to the defense.

A month later, at the November 6, 2017 pretrial conference, the government, the defense and the Court all agreed that the defense needed, and would be given notice of, the trade sequences that would be offered at trial whether or not they were charged as substantive counts:

> MR. FRANCIS: We'll pick some trades, we'll charge those, *we'll put the defense on notice of what trades we intend to offer, if there are any that are not charged as substantive counts* as part of the scheme, and that will be our case.  That will be the sort of universe of victims that we would anticipate would testify.

Nov. 6, 2017 Conference Tr. at 12:14-20 (emphasis added).

> MR. MUKASEY: . . . Well, obviously I can't prepare for a trial if the government hasn't picked out which trades it's going to charge from its embarrassment of riches. And I would like, if possible, to avoid bill of particulars motion practice. And it is true that in the other trial that I had with Mr. Francis and his colleague, *they did let us know what trades they were going to prove up at trial, what trades they thought were part of the scheme and part of the substantive counts*.  So as soon as they let me know whether that's going to be five trades, ten trades, 50 trades or 100 trades, I would better be able to tell how long it will take me to prepare for trial.

> \* \* \* \*

> MR. MUKASEY: Again, I don't know what I'm looking at in terms of the size of the case, *the number of trades that are going to be proved up.*  But assuming -- and this is just based on my experience with the Connecticut office in this last trial, assuming that it is a manageable amount, ten or twelve trades or a bit more, a bit less, we would go, you know, first week of May, second week of May, third week of May, end of April, and any time in June.

*Id.* at 13:20-14:7; 16:25-17:8 (emphases added).

> THE COURT: . . . And so I have to trust the government's going to ensure that it is giving advance notice of the expected transactions *that will be the subject of proof at trial, whether they actually are formally charged and itemized as distinct counts or overt acts or whether they're going to be essentially just evidence of the scheme*, I'd like the government to be focused on doing that.

*Id.* at 19:17-23 (emphasis added).

> MR. FRANCIS: . . . I understand why Your Honor is focused on making sure the defense has notice of what our evidence is going to be like.  It makes a huge difference in making the trial move more quickly, as Mr. Mukasey knows.  So my proposal would be after we indict the case, some period of time afterwards, I would suggest that we just set a date where we notify the defense, we can build it

into the calendar, of what the government's scheme evidence would be.  It's not 404(b) because it's part of a charged scheme, but *it would be sort of what the government's trial evidence, if there are any trades other than those charged.* We've done that in the RMBF [sic] cases that have some similarities to this case and that's worked well with Judge Hall and before Judge Chatigny.  *That's my suggestion for how to deal with that issue.*

*Id.* at 20:17-21:7 (emphases added).

MR. MUKASEY: . . . And as Mr. Francis mentioned, the real preparation and the real beginning to understand the case is when the government identifies the needles in those haystacks.  And that is the trades that constitute parts of the scheme, the trades they'll prove up at trial, the trades that are going to be charged substantively or as overt acts.  My understanding is they haven't determined that yet, so we are sitting on the haystack and just waiting to hear where the needles are.  Generally, and Mr. Francis is right, in the last case that I tried against his office, there were thousands and thousands and thousands of trades.  And working cooperatively, *we were able to winnow it down to the universe of trades that were going to be discussed at trial.  And if we have an April trial date, I hope that we can get identification of those trades that will play a role in the trial as soon as possible.*

*Id.* at 23:1-17 (emphasis added).

MR. FRANCIS:  However, we will identify it for them, so that the ones that we're going to use perhaps as the cleanest examples or obvious examples . . .

*Id.* at 24:18-21.

Again, at the December 4, 2017 pretrial conference, the defense pressed the importance

of learning which trade sequences would be presented at trial:

MR. MUKASEY: . . . And it has been the tradition of my dealing with this office that before the superseder, after the superseder, at some point well in advance of trial, *we ought to know 10 of the 15 trades they're going to focus on,* 15 of the 20, 17 of the 18.

\* \* \* \*

MR. MUKASEY:  . . .  Mr. Francis said in the last call that it was the U.S. Attorney's Office procedure in cases like this with the limited data to inform the other side what 15 or 20 or 10 trades they're going to focus on.  That's what I expect.  I'm just saying January 29th is too late for that.

\* \* \* \*

MR. MUKASEY: . . . [I]t's unreasonable to expect us to wade through that and *find the ten or 12 that they think are going to be the key focus,* even when the whole background of the thousand is going to be evidence of the scheme.

Dec. 4, 2017 Conference Tr. at 5:20-24; 7:1-6; 17:13-17 (emphases added).

THE COURT: . . . But I can't see why the government couldn't essentially come up with essentially a list of the top 25, the 25 transaction pairs or pairings or groupings, those occurring within a close period of time, that it thinks it's likely to be charged. Now, it may be that it ends up they don't bear out, the experts say, no, you can't get the data you need when you're scrambling for more information just before you get to the grand jury by the end of January. But I don't see why the government wouldn't essentially have a top 25 list. And I don't think that's too big for the 2000 lawyers that –

MR. MUKASEY: Not at all. And I'm not going to be a pain in the neck about this. If they give us 20 and they want to add in ten more, I get it. If they give us 25 and they want to subtract ten, I'm not going to be a crazy stickler about it. But I will tell you I worked super well with Mr. Novick in a case that had millions of lines of trade data. As we progressed through discovery and through motion practice and up until trial we had an open dialogue, we're going to prove these trades, these are going to be overt acts, these are going to be proved up sort of by witness testimony, these are going to be charged as subsequent counts, and there was a little bit of back-and-forth –

THE COURT: I understand.

MR. MUKASEY: -- but it worked really well that way.

MR. PERRY: So that's fine, Your Honor. We'll do that. We'll identify the 25 trades that we think are most likely, maybe not all of them, to make their way into a superseding indictment by the end of the month, if that's satisfactory to Your Honor.

THE COURT: I think by the 29th I'm going to ask you to do that. I would ask you to disclose by the 14th what we'll call the super list of the thousand or so that you think apparently your experts are betting for potential inclusion. And then by the 29th to have the additional, the list of what you in good faith believe are those top 25. *And if they turn out to be very different come indictment time, then I think I'm going to have to deal with that at that point.* To the extent the list is over-inclusive, I can't see that there's really a prejudice. *If it's under-inclusive without warning, you haven't seasonably updated them concerning some sort of new transaction, I'd have to deal with that as well.*

MR. PERRY: Certainly, Your Honor. We're not going to just pick 25 and go with a different 25.

THE COURT: I'll say for the record, Mr. Perry, you had a trial with me, a very different kind of subject matter, but you basically understood how the government can select out particular transactions of focus among many. And that was an efficient, appropriate way to present to the jury. I know you're well familiar with how to present a case.

*Id.* at 18:6-20:10 (emphases added).

After the December 4 conference, the Court issued the December 6th Scheduling Order, which stated in relevant part:

> The Government shall produce to defendant the details of the initial set of approximately 1000 transactions related to the alleged conspiracy by December 14, 2017**.** *Thereafter, the Government shall produce to defendant by December 29, 2017, a list of the 25 spoof/primary-order transactions that the Government believes are most likely to be the focus of any superseding indictment and trial evidence . . .* It is so ordered.

ECF No. 45 (emphasis added).

## ARGUMENT

When viewed against the discussions set forth above, the government's current position is fanciful. The Top 25 List was not simply a list of potential substantive counts. It is not now obsolete. To the contrary, the government was ordered by the Court – and clearly agreed – to provide notice of the trade sequences that would be discussed at trial, whether they were charged as substantive counts, overt acts, scheme evidence, or sample "spoofs." That is why the defense spent hundreds of hours over the past two months culling and analyzing the reams of data associated with the Top 25 List.

Now, four weeks before trial, the new government team has decided to ignore the prior representations, defy the Court's Scheduling Order, and disregard the agreement that the parties reached with the Court, by abandoning 21 of the Top 25 trade sequences and replacing them with new trade sequences that could not have been identified without government guidance. The introduction of these new trade sequences will require the defense to undertake an immense

amount of new data collection and analysis.  To gain a complete grasp of each trade sequence, the defense must look at several different data sources, such as:

1. Order and trading data from SwisKey, UBS's in-house proprietary trading system, which the traders used to enter, modify, and cancel their precious metals orders on the exchange;

2. Order and trading data from COMEX, the electronic futures exchange on which Mr. Flotron entered the orders at issue in the Superseding Indictment; and

3. Market depth data (a.k.a. the limit order book) from COMEX, which details the top ten bids and offers available on COMEX at any given time.

Each of these data sets, particularly those provided by COMEX, is massive, sometimes comprising terabytes of data.  This is because the precious metals futures market on COMEX is extremely active, such that tens and even hundreds of market changes can occur in a single second.  For the defense to adequately analyze each new trade sequence put forth by the government, it must first isolate and extract the relevant data (which by itself is a time-consuming process given the vast size of the data sets) and then review and analyze the relevant extracts (which is again a time-consuming process).  This analysis is critical because, while the government may want the jury to focus narrowly on extremely small chronological snippets of data that it alleges to be fraudulent, the defense must illustrate how these tiny snippets fit into Mr. Flotron's broader legitimate trading activity.

The Court ordered the government to provide the Top 25 List on December 29th. Additionally, the Court warned that if the trade sequences were substantially different at the time of the Superseding Indictment, the Court would address the issue.  Now, more than a month after the Superseding Indictment, the government has chosen to replace 21 of the 25 trade sequences that it identified.  At no point since December 2017 did the government alert the defense that it intended to replace the vast majority of the trade sequences on the Top 25 List with different

ones; rather, the government simply placed the new trade sequences on the Exhibit List without notice as a *fait accompli*.  We learned it only when we received the Exhibit List.

At the very least, the government could have informed the defense in January, or even February, that the Top 25 List of trade sequences was not what the government intended to use at trial.  While this would have still been problematic, the government's Lucy-pulling-the-football tactic is even more troubling because Mr. Flotron should not have to sacrifice his Speedy Trial rights to obtain basic information about the proof at trial.

The Court enjoys broad discretion to remedy a violation of the discovery order, including by granting a continuance or prohibiting a party from introducing certain evidence at trial.  *See* Fed. R. Crim. P. 16(d)(2) ("If a party fails to comply with this rule, the court may . . . grant a continuance [or] prohibit that party from introducing the undisclosed evidence"); *United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988) (affirming preclusion of government evidence at trial where it produced report after date the court's discovery schedule required); *United States v. Campagnuolo*, 592 F.2d 852, 858 (5th Cir. 1979) (no abuse of discretion when "a district judge for prophylactic purposes suppresses evidence . . . the government should have disclosed earlier").

The defense does not seek a continuance.  We will be prepared to proceed to trial on April 9th and defend Mr. Flotron's actions on any of the trade sequences on the Top 25 List.  We will further be prepared to address, *en masse*, the remainder of the 1,273 Orders of Interest if the government can succeed in offering them into evidence.  But the government's last-minute disavowal of the Top 25 List, and its replacement of 21 of those 25 trade sequences with new ones, flouts the Court's December 6th Order and flies in the face of our reasonable expectations.

The government's conduct lays waste to the defense's preparations to date and virtually compels us to seek an adjournment that the defendant does not want.

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests that the Court grant this Motion to Preclude Evidence Relating to Trading Activity Not Timely Disclosed.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By:  /s/ Marc L. Mukasey
　　　Marc L. Mukasey (ct29885)
　　　Nathan J. Muyskens (phv09472)
　　　200 Park Avenue
　　　New York, NY 10166
　　　Telephone: (212) 801-6832
　　　Facsimile: (212) 801-6400
　　　*Attorneys for Defendant Andre Flotron*

**AFFIRMATION OF SERVICE**

I hereby certify that on March 5, 2018, a copy of the foregoing Memorandum of Law in Support of Defendant's Motion to Preclude Evidence Relating to Trading Activity Not Timely Disclosed was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


Dated: New York, New York
       March 5, 2018

                                        /s/ Marc L. Mukasey
                                       Marc L. Mukasey
                                       Greenberg Traurig, LLP
                                       200 Park Avenue
                                       New York, NY 10166
                                       Telephone: (212) 801-9200
                                       Facsimile: (212) 801-6400
                                       Email: mukaseym@gtlaw.com