UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ANDRE FLOTRON,<br><br>           Defendant. | S1 17 Cr. 220 (JAM)<br><br>March 9, 2018 |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO COMPEL**

Defendant Andre Flotron, by and through the undersigned counsel and pursuant to Rule

17 of the Federal Rules of Criminal Procedure, respectfully submits this reply memorandum of

law in further support of his motion to compel Quantlab Financial LLC ("Quantlab") to produce

documents responsive to Request #1 in the subpoena *duces tecum* issued to it on February 7,

2018 (the "Subpoena") (ECF No. 86).

**INTRODUCTION**

At trial, the government will argue that Mr. Flotron defrauded complex, sophisticated

computer programs, like Quantlab's, placing those complex trading algorithms at the center of

this case. But rather than introducing those algorithms into evidence, it appears that the

government will seek to elicit surface-level, conclusory testimony about them and their trading

decisions as an inadequate substitute. Mr. Flotron should not be required to be a passenger to the

government's trial strategy and should not be limited to blind cross-examination of witnesses

who supervise algorithms. He is entitled to disclosure of those algorithms as relevant and

admissible evidence pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure.

In opposing Mr. Flotron's Motion to Compel, Quantlab first argues that Mr. Flotron has

no need for the trading algorithms because "the source code . . . is unnecessary to understand" how its algorithms work. Quantlab Financial LLC's Memorandum of Law in Opposition to Defendant's Motion to Compel at 7 (Mar. 7, 2018), ECF No. 105 ("Opp."). Quantlab contends that its algorithms account for a common and standard metric – "order book pressure" – that Mr. Flotron allegedly influenced, and therefore he need not inquire any further into the operations of their complex trading system. Measuring order book pressure is neither common nor standard. It is one of many variables that are highly-customized by algorithmic trading firms, which is the very reason to protect its confidentiality. Quantlab's employees have acknowledged in interview memoranda that Quantlab constantly adjusted the factors that went into its order book pressure analysis, and sometimes made those adjustments on an *ad hoc* basis. Moreover, by Quantlab's own admission, order book pressure was only one factor that its algorithms considered before entering bids or offers of their own: "Quantlab's employees, when interviewed, told the government that Quantlab had designed programs, such as Trader 1t, to trade using order book pressure *as one of the relevant 'signals'* considered by the program." Opp. at 2 (emphasis added). Without those additional factors, the jury cannot consider the broad scope of information that Quantlab's algorithms analyze before deciding to trade, and ultimately decide whether Mr. Flotron's individual orders were material to that decision.

In the face of Mr. Flotron's request for squarely relevant evidence, Quantlab's final argument is that its algorithms are subject to overriding trade secret protection. But Quantlab cites not a single case in which a company's proprietary commercial interests outweighed a criminal defendant's right to discover critical exculpatory evidence, particularly where there was little doubt that the requested documents will be relevant and admissible. That is because courts

regularly acknowledge the opposite: when a criminal defendant makes a specific request for such important evidence, trade secrets must be disclosed.

Ultimately, Quantlab's arguments suffer from the same defects as its witnesses' expected testimony. Quantlab asks the defense to accept without support that its algorithms incorporated "order book pressure," while admitting, without elaboration, that its algorithms also looked at other factors. A criminal defendant cannot be expected to rely on faith alone for the fact that his "victims" were indeed victimized, or that his bids and offers were material to any computer's investment decision. The Court should grant Mr. Flotron's motion to compel Quantlab to produce documents responsive to the Subpoena.[1]

### DISCUSSION

A.    The Documents Requested Are Relevant,
       Admissible, And Necessary For Mr. Flotron's Defense

The requested information is relevant, admissible, and necessary for Mr. Flotron's defense. It is therefore exactly the type of information that must be disclosed under Rule 17(c). Quantlab does little to contest the information's relevancy or admissibility. Instead, it argues that Mr. Flotron has little need for the information because "there is no secret in how to calculate the 'pressure' that supply and demand exerts on the order book," and the source code is "unnecessary to understand how trading algorithms that utilize order book pressure work." Opp. at 2, 7. Specifically, Quantlab argues that its algorithms consider "order book pressure," which is a measure of whether there is "more interest on the buy or sell side" of the market. Opp. at 2.

---

[1] Quantlab raises important concerns about whether a protective order could adequately defend their trade secret interests. The defense is open to working with Quantlab to take the necessary steps to ensure that its data is protected, and that any use is in a carefully controlled environment, such as a secured data facility or closed courtroom proceeding. The defense is currently negotiating a protective order with another third-party witness so that both the defense and the witness's interests will be preserved.

Quantlab suggests the defense should rely on publicly-available articles on the general topic. Opp. at 7.

Quantlab misunderstands Mr. Flotron's need for the requested evidence. Quantlab's own employees have acknowledged repeatedly in interviews with government attorneys that they frequently updated the factors that went into their calculation of order book pressure. Nor is there any common or standard measure of order book pressure. According to those employees, while Quantlab trading algorithms sometimes looked at all of the orders in the order book, at other times those algorithms looked at only a small portion of them.[2] This level of variability goes far beyond the standardized "meatloaf" with "slight[] differen[ces]" that Quantlab claims in its opposition. Opp. at 7. Moreover, Quantlab downplays the importance of the many "relevant signals" that informed its algorithms' decisions to trade or not trade. The defense understands that Quantlab employees regularly adjusted the weight given to the various "signals" on a given day, and even excluded some "signals" on some days. Again, that level of variability makes it absolutely critical for Mr. Flotron to gain access to the algorithm running on a given day so that he may introduce evidence of that algorithm at trial. Even now, after several meetings with government lawyers and briefing before this Court, Quantlab has said little about the other "relevant signals" its algorithms consider.

Neither Mr. Flotron nor the jury should have to guess at whether and how Quantlab's algorithms factored in Mr. Flotron's alleged "spoof" orders when that information is available and subject to disclosure under Rule 17(c).

---

[2] Quantlab suggests in its Motion to Quash that its algorithms considered bids and offers at "the first two levels of the order book." Quantlab Financial LLC's Motion to Quash Subpoena Duces Tecum at 2 ¶ 8, *In re Quantlab Financial LLC*, No. 18 Mc. 20 (JAM) (D. Conn. Mar. 1, 2008). First, the defense needs to analyze the algorithms to determine the veracity of that statement. Second and more importantly, the trades at issue in the case do not merely relate to orders at the first two levels of the order book. Thus, by Quantlab's own admission, its algorithms may not have been factoring in Mr. Flotron's alleged "spoof" orders. The only way for Mr. Flotron to prove that the algorithms were not factoring in his alleged "spoof" order at a particular date is by reviewing Quantlab's algorithms on that date.

B.      <u>Quantlab's Claim To Trade Secrets Protection Does Not Shield It From Producing Documents Pursuant To A Valid Subpoena *Duces Tecum*</u>

Mr. Flotron has a right under Rule 17(c) to disclosure of evidence that is relevant and admissible. *See United States v. Nixon*, 418 U.S. 683, 699-700 (1974).[3] Here, he has satisfied that standard, yet Quantlab persists in its argument that the company's trade secrets protection gives it the authority to withhold production of critical exculpatory evidence.[4]

Quantlab cites to several cases seriatim for the proposition that its commercial interest in its trade secrets should defeat Mr. Flotron's subpoena. *See* Opp. at 5-6. Those cases are inapposite and have no bearing on the instant motion. In those cases, courts found that the requested trade secret had marginal or no relevance to the dispute between the parties, or that the party requesting the subpoena had not made a threshold showing that disclosure of the requested trade secret would reveal relevant information. For example, in *Banner Indus. of N.E. v. Wicks*, No. 1:11-cv-1537, 2013 U.S. Dist. LEXIS 150559 (N.D.N.Y. Oct. 21, 2013), the district court denied a request for disclosure of trade secrets after concluding that that the requested information was "outside the scope of the present litigation" and was "not relevant" to the alleged misconduct. *Id.* at *26, *29; *see also Bell Atl. Bus. Sys. Servs. v. Hitachi Data Sys. Corp.*, No. M8-85, 1995 U.S. Dist. LEXIS 265, at *3-4 (S.D.N.Y. Jan. 13, 1995) (holding that

---

[3] The *Nixon* standard additionally requires that the defendant show that (1) the requested documents "are not otherwise procurable reasonably in advance of trial;" (2) "that the party cannot properly prepare for trial without such production;" and (3) "that the application is made in good faith and is not intended as a general fishing expedition." *United States v. Nixon*, 418 U.S. 683, 699-700 (1974). Mr. Flotron has satisfied these additional requirements as well. *See* Memorandum Of Law In Support of Defendant's Motion To Compel at 7-9 (Mar. 1, 2018), ECF No. 87 ("Deft. Br.").

[4] Quantlab makes the additional argument that Mr. Flotron is not entitled to the requested documents because impeachment evidence is not subject to disclosure under Rule 17(c). Opp. at 8-9. This argument is apparently based on Mr. Flotron's statement that the documents are necessary to "effectively prepare and cross examine" the government's witnesses. *Id.* at 8 (quoting Deft. Br. at 11-12). Mr. Flotron seeks the requested documents for their evidentiary value and with the intent of introducing the documents or a subset of the documents into evidence. As discussed above, they are relevant to issues that are central to Mr. Flotron's defense, including the materiality of the alleged misrepresentations. The fact that he may use the evidence during cross-examination of a witness, among other times during trial, does not render it undiscoverable "impeachment" evidence.

proponent of subpoena had not made threshold showing that requested trade secret would have

misappropriated information contained in it); *Viacom Int'l Inc. v. Youtube Inc. et al.*, 253 F.R.D.

256, 260-61 (S.D.N.Y. 2008) (holding that proponent of subpoena had not made "plausible"

showing that trade secret acted in way alleged, and concluding that proponent's allegations were

"speculative"); *People v. Cialino*, 831 N.Y.S.2d 680, 682 (N.Y. Sup. Ct. 2007) (holding that

defendant had not provided sufficient basis for view that software update caused test results to be

unreliable and disclosure of trade secrets in software was therefore unwarranted).[5]

Quantlab also cites *United States v. Aleynikov*, No. 10 Cr. 96 (DLC) (S.D.N.Y. 2010), for

the proposition that third parties may block computer code from disclosure even in criminal

cases. However, in that case like others cited by Quantlab, the defendant could not show that the

requested information was relevant and necessary to the contested issues at trial. In *Aleynikov*,

the defendant was charged with stealing two portions of code from a proprietary electronic

trading platform. Indictment, *Aleynikov*, No. 10 Cr. 96 (Feb. 11, 2010), ECF No. 18. The defense

wanted to show at trial that the misappropriated code excerpts did not have "independent

inherent intrinsic economic value" because they were only portions of a larger computer

platform. Hearing Transcript at 6:1-7:14, *Aleynikov*, No. 10 Cr. 96 (S.D.N.Y. June 29, 2010),

ECF No. 66-1. The court held that accessing source code for the portions *not* misappropriated

would be inappropriate because it was unnecessary to prove the essential fact that defendant did

not steal a complete, fully functioning trading platform. *Id.* at 56:5-11 ("The issue is . . . would it

be helpful to the defendant to show the source code and the specific algorithms *that constitute*

---

[5] Quantlab cites cases involving the misappropriation of trade secrets, which are further distinguishable because the actual mechanical operation of the trade secrets were not at issue in those cases or were only ancillary issues. *See Quantlab Technologies, Limited (BVI) v. Kuharsky*, 696 Fed. App'x 682 (5th Cir. June 22, 2017); Hearing Transcript, *Aleynikov*, No. 10 Cr. 96 (S.D.N.Y. June 29, 2010), ECF No. 66-1; *Bell Atl. Bus. Sys. Servs.*, 1995 U.S. Dist. LEXIS 265, at *3-4.

*the other components of the Goldman's trading strategy*, and my analysis is absolutely not, that

would not be helpful to the jury.") (emphasis added).[6]

Here, Mr. Flotron has far exceeded any threshold showing that the requested algorithms

would reveal relevant information. The entire scope of Quantlab's employees' testimony in this

case will concern the operation of their trading algorithms, and the effect that certain inputs had

on the trading decisions of those algorithms. Moreover, government interviews of Quantlab's

employees make clear that their algorithms look at a number of relevant factors – which may or

may not include Mr. Flotron's orders – and the nature of those constantly changing factors is

highly relevant to the defense. The various factors the algorithms consider are at the heart of the

materiality element of commodities fraud because they collectively constitute the total mix of

information available to the algorithms, the government's purported "reasonable investors."[7]

---

[6] In other instances, Quantlab cites cases where defense requests for DNA algorithms were denied because the defendants were fishing for deficiencies in DNA test results and were provided with an opportunity to verify that data. *See People v. Superior Court*, No. B258569, 2015 Cal. App. Unpub. LEXIS 105, at *25-32 (Cal. Ct. App. Jan. 9, 2015) (interpreting California rules of evidence) (holding that after defendant received specific information about DNA algorithm's underlying assumptions and opportunity to test the algorithm, he had not shown a "necessity" for the source code as well); *State v. Traylor*, 656 N.W.2d 885, 889-90 (Minn. 2003) (holding that when defendant simply sought to verify accuracy of DNA results, it was sufficient to produce "validation studies" under protective order without producing the underlying code); *see also United States v. Doyle*, 1 F. Supp. 2d 1187, 1188 (D. Or. 1998); *State v. Bastos*, 985 So.2d 37, 42-43 (Fla. App. 2008). Here, Quantlab has produced no such intermediary data, and Mr. Flotron is not seeking to simply "verify" routine test results.

[7] Quantlab cites to a single case form another circuit for the proposition that a statement is "material" in the context of commodities fraud if it is "capable of influencing" an investment decision. *See* Opp. at 7 n.3 (citing *United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017)). Relative to other federal fraud statutes, "there is a dearth of case law addressing § 1348." *United States v. Melvin*, No. 14 Cr. 22, 2015 WL 7116737, at *5 (N.D. Ga. May 27, 2015), *report and recommendation adopted*, 143 F. Supp. 3d 1354 (N.D. Ga. 2015). However, "[s]everal courts [within the Second Circuit] have recognized that 'because the text and legislative history of 18 U.S.C. § 1348 clearly establish that it was modeled on the mail and wire fraud statutes,' an analysis of Section 1348 'should be guided by the caselaw construing those statutes.'" *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *9 n.6 (S.D.N.Y. Jan. 18, 2017) (quoting *United States v. Motz*, 652 F. Supp. 2d 284, 296 (E.D.N.Y. 2009)); *see also United States v. Mahaffy*, No. 05 Cr. 613, 2006 WL 2224518, at *11 (E.D.N.Y. Aug. 2, 2006). Courts in this District have found that a statement is material in the context of mail or wire fraud if there is a "substantial likelihood" that a reasonable investor would find that the statement "significantly alter[ed] the 'total mix' of information made available." *United States v. Ferguson*, 553 F. Supp. 2d 145, 152 (D. Conn. 2008) (quoting *Basic v. Levinson*, 485 U.S. 224, 231 (1988)); *see also* Trial Tr. 2646:24-2647:3; 2661:9-16, *United States v. Shapiro*, No. 15 Cr. 155 (D. Conn. June 1, 2017). Mr. Flotron will fully brief the standard for materiality under the commodities fraud statute in its Proposed Request to Charge, to be filed on or before March 26, 2018. *See* ECF No. 45 (scheduling order).

In sum, Quantlab's claim to trade secrets protection should not block Mr. Flotron from obtaining critical evidence in his defense that is relevant and admissible.

C.     Mr. Flotron's Constitutional Rights Overcome
        Quantlab's Claim Of Trade Secrets Protection

Not only does Quantlab overstate the protection afforded to trade secrets subject to disclosure under a valid criminal subpoena, but Quantlab also minimizes the constitutional protections afforded to a criminal defendant and the way in which those protections can require disclosure of key evidence, as they do here.

First, Quantlab argues that the Sixth Amendment's Confrontation Clause[8] provides only a trial right, meaning that the clause does not require disclosure at this pre-trial stage. That argument ignores case law that allows discovery of critical evidence before trial "in order to effectively prepare and cross examine" witnesses. *United States v. Mazzola*, 217 F.R.D. 84, 88 (D. Mass. 2003); *accord Bassine v. Hill*, 450 F. Supp. 2d 1182, 1185-86 (D. Or. 2006); *see also United States v. Lindstrom*, 698 F.2d 1154, 1167-68 (11th Cir. 1983). In an effort to minimize these holdings, Quantlab seeks to cabin those cases to a "limited exception applied by some courts where the extrinsic evidence directly bears on the witness's credibility at trial . . . ." Opp. at 11. The cases themselves, however, create no such narrow exception. Rather, those cases and others stand for the proposition that criminal defendants have the right to access documents critical to confronting a witness against them, even where a privilege or protection might caution against disclosure in other circumstances. *See Mazzola,* 217 F.R.D. at 88; *Bassine,* 450 F. Supp.

---

[8] Quantlab also misses the point regarding Mr. Flotron's right to a public trial under the Sixth Amendment. The relevant question is not whether the public's First Amendment right to public access attaches to Quantlab's algorithms while they sit as private documents now, *see* Opp. at 16, but rather whether Mr. Flotron's Sixth Amendment right to a public trial will be a nullity if he is allowed to be convicted based on essentially secret evidence. The answer to the latter question is yes. *See Huminski v. Corsones*, 396 F.3d 53, 81 (2d Cir. 2005); *Waller v. Georgia*, 467 U.S. 39, 46 (1984). It is this right that is threatened by the government's plan to elicit testimony from Quantlab witnesses about the alleged effect of Mr. Flotron's trading activity on their algorithms, and Quantlab's simultaneous invocation of trade secrets protection of the actual systems that were allegedly affected.

2d at 1185-86; *see also Lindstrom*, 698 F.2d at 1167-68; *see also United States v. Soc'y of Indep. Gasoline Marketers of Am.*, Nos. 77-2515 et al., 1980 U.S. App. LEXIS 21757, at *24 (4th Cir. 1980) ("Although a trial court should seek to prevent the disclosure of embarrassing, irrelevant information concerning a witness, it is an abuse of discretion to preclude defense counsel from obtaining relevant information, and the witness' privacy must yield to the paramount right of the defense to cross-examine effectively the witness in a criminal case.").[9]

Next, Quantlab reads too narrowly Mr. Flotron's Fifth Amendment right to present a complete defense. The Fifth Amendment right to present a complete defense provides that, "at a minimum, . . . criminal defendants have the right . . . to put before the jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). This constitutional right, together with others, "delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." *California v. Trombetta*, 467 U.S. 479, 485 (1984). Quantlab correctly notes that the right to present a complete defense is often legitimately constrained by the rules of evidence and rules of procedure. Opp. at 14. But courts have been clear that those rules of evidence and procedure must bend when their application would render a trial "fundamentally unfair." *Morales v. Portuondo*, 154 F. Supp. 2d 706, 723 (S.D.N.Y. 2001); *see, e.g.*, *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Washington v. Texas*, 388 U.S. 14, 20 (1967); *see also United States v. Weisberg*, No. 08 Cr. 347 (NGG), 2011 WL 1327689, at *5 (E.D.N.Y. Apr. 5, 2011) (noting that that attorney-client privilege may be overcome if otherwise privileged information "is nevertheless so important to the defense that its disclosure is

---

[9] To further rebut Mr. Flotron's Confrontation Clause argument, Quantlab cites non-binding cases where defendants conducted fishing expedition-type discovery under cover of the Confrontation Clause and were subsequently rebuked. *See United States v. Ahmed*, 2011 U.S. Dist. LEXIS 120191, at *7 (S.D.N.Y. Sept. 23, 2011); *Superior Court*, 2015 Cal. App. Unpub. LEXIS 105, at *32.

constitutionally required"). There should be no doubt that allowing Mr. Flotron to face testimony *about* trading algorithms' functions while withholding his *access to* those algorithms under a trade secrets protection would render the trial "fundamentally unfair." Therefore, he has a right to compel the production of the requested documents as part of his right to a complete defense.

* * *

In its Opposition Brief and supporting affidavit ("Aff.") (ECF No. 106), Quantlab refers to Mr. Flotron as an "accused fraudster" and states its fear of turning over trading algorithms to an individual who, if convicted, "had committed financial fraud." Aff. at 2; Opp. at 17. Quantlab's total disregard for the presumption of innocence and its jaundiced view of what Mr. Flotron will do if the trading algorithms are disclosed is emblematic of why the defense cannot simply take Quantlab's word for how its trading algorithms operate or were allegedly affected. Quantlab already views Mr. Flotron with suspicion, and the defense cannot rely on Quantlab's unverified testimony about their algorithms without inspecting the algorithms themselves.

## CONCLUSION

For the foregoing reasons, the Court should issue an order compelling Quantlab to produce documents responsive to Request #1 in the Subpoena.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By:  /s/ Marc L. Mukasey
  Marc L. Mukasey (ct29885)
  Nathan J. Muyskens (phv09472)
  Daniel P. Filor (phv08911)
  200 Park Avenue
  New York, NY 10166
  Telephone: (212) 801-6832
  Facsimile: (212) 801-6400
  *Attorneys for Defendant Andre Flotron*

**AFFIRMATION OF SERVICE**

I hereby certify that on March 9, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated:  New York, New York
        March 9, 2018

/s/ Marc L. Mukasey
Marc L. Mukasey
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mukaseym@gtlaw.com
