# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*, | |
| v. | No. 3:17-cr-00220 (JAM) |
| ANDRE FLOTRON,<br>*Defendant*. | |

### ORDER DENYING MOTION TO DISMISS SUPERSEDING INDICTMENT

This is a criminal case about an alleged conspiracy to engage in commodities fraud involving the trading of precious metals futures contracts. Defendant Andre Flotron has filed a motion to dismiss the superseding indictment. I conclude that the indictment properly alleges the legal requisites and facts to establish an unlawful conspiracy to commit commodities fraud. I further conclude that the superseding indictment is not unconstitutionally vague. Accordingly, I will deny defendant's motion to dismiss.[1]

### BACKGROUND

The superseding indictment alleges that defendant traded in futures contracts for precious metals on behalf of UBS AG, one of the world's largest banking and financial services companies. According to the indictment, "a precious metals futures trader can defraud market participants by bidding to buy or offering to sell precious metals futures contracts with the intent, at the time the bid or offer is placed, to cancel the bid or offer before it is executed." Doc. #58 at

---

[1] The superseding indictment also alleges six additional substantive counts that were previously dismissed by agreement of the parties for lack of venue. *See United States v. Flotron*, 2018 WL 940554 (D. Conn. 2018). The remaining conspiracy charge under 18 U.S.C. § 1349 is predicated on an agreement to engage in the substantive crime of commodities fraud, in violation of 18 U.S.C. § 1348. Doc. #58. The Government stated at oral argument that it intends to proceed solely on a theory that defendant conspired to violate 18 U.S.C. § 1348(1) by means of a scheme to defraud rather than to violate § 1348(2) by means of material misrepresentations, promises, and omissions. Doc. #131 at 79-80.

1

3 (¶ 9). The indictment explains how such a practice—known as "spoofing"—may be used to defraud market participants:

   a. A trader places one or more large orders either to buy or to sell certain futures contracts which the trader intends to cancel before they are executed (the "Trick Orders"). To drive prices up, the trader places Trick Orders to buy, which create the false impression in the market of increased demand. To drive prices down, the trader places Trick Orders to sell, which create the false impression in the market of increased supply.
   b. In conjunction with the Trick Orders, the same trader also places, on the opposite side of the market, one or more orders in a much lower quantity that the trader actually intends to execute (the "Genuine Orders").
   c. Other market participants react to the false impression created by the Trick Orders by offering to buy or sell at prices, quantities, and at times that they otherwise would not. This, in turn, often causes the market price of a given futures contract to rise or fall.
   d. When the market prices changes as a result of the Trick Orders in a manner, and to a degree, that the trader intends, the trader's Genuine Orders are often filled at favorable prices, quantities, and at times that otherwise would not have been available, but for the Trick Orders.

Doc. #58 at 3-4 (¶ 10).

The indictment goes on to allege that defendant and co-conspirators engaged in such practices for more than five years. It alleges that "[t]he Trick Orders placed by FLOTRON and his co-conspirators frequently, and fraudulently, induced other market participants to place offers to buy or bids to sell precious metals futures contracts at prices, quantities, and at times that they otherwise would not, driving up or down the price of those precious metals futures contracts and causing FLOTRON's and his co-conspirators' Genuine Orders to be filled." *Id.* at 5-6 (¶ 17). The indictment further alleges that "[b]etween approximately July 2008 and approximately November 2013, FLOTRON and his co-conspirators placed hundreds of Trick Orders for

precious metals futures contracts in an effort to cause Genuine Orders placed by FLOTRON and his co-conspirators to be filled at prices, quantities, and at times that they otherwise would not." *Id.* at 6 (¶ 20).

## DISCUSSION

It is well established that an indictment is legally sufficient if it tracks the elements of the offense and alleges facts with sufficient precision to give a defendant fair notice of the charge he must meet. *See, e.g.*, *United States v. Bout*, 731 F.3d 233, 240 (2d Cir. 2013). Moreover, when an indictment alleges a conspiracy, it need not allege with technical precision all the elements essential to the commission of the crime that is the object of the conspiracy. *Ibid.*

Defendant does nothing to suggest that the indictment here fails at a technical level to allege the requisite elements of the conspiracy crime or that it otherwise fails to give him fair notice as a factual matter of what the prosecution alleges that he did wrong. Defendant contends instead that the facts as alleged in the indictment do not amount to the crime of commodities fraud. He argues that he made no false or fraudulent representation to any market participant and that every buy or sell order he placed into the market was a *bona fide* order that was available to be traded upon by any market participant until later cancelled before execution. By his reckoning, even if the Government proves every fact it has charged in the indictment, he has committed no crime.

It is true that an indictment may be subject to dismissal if the facts it alleges do not amount to the charged crime. Nevertheless, a fact-based challenge to an indictment is not a permissible vehicle for the Court to scrutinize the anticipated sufficiency of the Government's evidence, because the Government is entitled to marshal and present its evidence at trial subject to a proper challenge for sufficiency under Fed. R. Crim. P. 29. Accordingly, my role at this pre-

trial stage is solely to determine whether, assuming all of the facts as alleged in the indictment are true, a jury could find that defendant engaged in the charged crime of a conspiracy to commit commodities fraud. *See United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012).

Defendant's attack on the factual adequacy of the indictment relies on a misunderstanding of the breadth of conduct that may amount to a scheme to defraud under federal criminal law. To begin with, a scheme to defraud does not necessarily require the prosecution to prove that there were any false statements or explicit misrepresentations. *See, e.g.*, *United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012). It is enough if a defendant while acting with intent to defraud knowingly engages in conduct—as distinct from explicit misrepresentations—to deceive someone else. As the Second Circuit has noted in an analogous context, "[c]onduct itself can be deceptive" and that "broad as the concept of 'deception' may be, it irreducibly entails some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 150 (2d Cir. 2008) (internal quotations and citation omitted).[2]

Here the indictment unquestionably alleges deceptive conduct: that defendant flooded the market with buy or sell "trick" orders that were placed with no intention that they be executed and that defendant did so to create a false impression of market demand and to steer market prices in his favor so that he could execute on "genuine" buy and sell orders that were placed on

---

[2] Defendant misplaces his reliance on *Williams v. United States*, 458 U.S. 279 (1982), in which the Supreme Court concluded that a bank customer's presentation of a "bad" check to a bank did not amount to a false statement or any factual assertion at all for purposes of a bank-false-statement prosecution under 18 U.S.C. § 1014. As later precedent recognizes, however, check kiting involving the presentation of "bad" checks to banks suffices to constitute a scheme to defraud for purposes of the bank fraud statute, 18 U.S.C. § 1344(1), a statute that is highly similar to the commodities fraud statute at issue here, 18 U.S.C. § 1348(1). *See United States v. Burnett,* 10 F.3d 74, 78 (2d Cir. 1993) (citing cases); *see also United States v. Doherty*, 969 F.2d 425, 428 (7th Cir. 1992) (noting that "[t]he plain meaning of 'scheme' is a 'design or plan formed to accomplish some purpose,'" and that "[t]o 'defraud' means '[t]o practice fraud,' 'to cheat or trick,'" and that "[c]heck kiting, at root, is a plan designed to separate the bank from its money by tricking it into inflating bank balances and honoring checks drawn against accounts with insufficient funds"). Accordingly, *Williams* has little to say about the scope of conduct that may suffice for purposes of a scheme to defraud.

the opposite side of the market. Under the most basic laws of supply and demand, it is obvious that placing large orders on one side of a market may impact prices for those who take opposite positions in the same market. Because the indictment alleges that this market-altering conduct was engaged in with an intent to defraud and by means of conduct that created a false picture about demand in the market, the indictment adequately alleges facts that constitute a crime within the scope of the commodities fraud statute.

Defendant tries to assign a different meaning to his conduct: that his placing of orders "was nothing more than a representation that UBS was willing to buy or sell a certain number of futures at a stated price," and that this representation was "indisputably true, equally so for every single order placed by Mr. Flotron, whether filled or not." Doc. #67 at 17-18. Even if true, this argument overlooks that conduct may have more than one meaning and likewise be intended for more than one reason. My role in assessing a pre-trial challenge to the indictment is not to gauge the strength of the evidence or to try to draw inferences about what defendant actually intended or whether his conduct was actually deceptive in nature. It is enough for now that the indictment has alleged the elements of the crime as well as enough factual matter to support a *prima facie* conclusion that defendant's conduct falls within the scope of what the law forbids.

Similarly, the possibility that any of the alleged "trick" orders might have been accepted or executed upon by someone else in the market does not legitimate the conduct as a matter of law. This is especially so if defendant placed "trick" orders believing it unlikely that any or many of these orders would end up being filled before he could cancel them or if he otherwise stood willing to accept the possibility of some of the "trick" orders being filled as merely an inconvenient cost of doing (fraudulent) business.

Nor is it dispositive that the bare conduct at issue here—placing orders that were not filled before they were cancelled—is not itself against the law. Fraudulent schemes often involve acts that seem innocuously innocent when viewed in isolation but that are part-and-parcel of a scheme to defraud when viewed in their broader context. *See, e.g.*, *Schmuck v. United States*, 489 U.S. 705, 714-15 (1989). All in all, the indictment alleges enough facts to validly charge a conspiracy to engage in commodities fraud.

In a case involving similar allegations of commodities fraud, the Seventh Circuit has rejected the kinds of arguments defendant makes here. *See United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017), *reh'g and suggestion for reh'g en banc denied* (Sept. 5, 2017), *petn. for cert. filed sub nom. Coscia v. United States*, No. 17-1099 (Feb 2. 2018). The Seventh Circuit concluded in relevant part that defendant Coscia had "designed a scheme to pump and deflate the market through the placement of large orders" and that "[h]is scheme was deceitful because, at the time he placed the large orders, he intended to cancel the orders." *Id.* at 797. As to defendant Coscia's argument that his orders were not illusory because they could have been filled once entered onto the market, the Seventh Circuit concluded that this argument "confuses *illusory* orders with an *illusion* of market movement" that was the crux of the scheme to defraud. *Ibid.*

Defendant tries to distinguish *Coscia* on grounds that it involved the use of a specific computer program to stop or deter the filling of any of the alleged "trick" orders. *See Coscia*, 866 F.3d at 797 & n.64 (discussing trial evidence about operation of program that resulted in all but 0.08% of large suspect orders not being filled); *see also United States v. Coscia*, 100 F. Supp. 3d 653, 660 (N.D. Ill. 2015) (noting that indictment alleged that "Coscia designed his programs to cancel automatically all the quote orders placed"). This factual distinction is unconvincing. What matters for legal sufficiency purposes is not whether a trader programmed a computer to stop any

"trick" orders from being filled but whether the trader placed such "trick" orders in the first place expecting and intending that they not be filled and that they create a false impression in the market.

Defendant relies on *United States v. Radley*, 659 F. Supp. 2d 803 (S.D. Tex. 2009), *aff'd*, 632 F.3d 177 (5th Cir. 2011), in which both the district court and the Fifth Circuit concluded in essence that it would not be fraudulent for a trader to place market-manipulating bids provided that the bids were in and of themselves lawful and that the trader was prepared to follow through on such bids if accepted. *See* 659 F. Supp. 2d at 815-16; 632 F.3d at 183-84. I do not agree with these courts' reasoning. The fact that a trader may make good on some portion of market-manipulating bids that he did not intend or expect to have to fulfill neither detracts from nor sanitizes the fraudulent nature of such bids if they were placed in the first instance for no reason other than to create a false impression in the market and to shift prices in the trader's favor on the opposite side of the market.

Indeed, just as when a Ponzi schemer opts to cloak his activity with an aura of legitimacy by paying returns to some investors, the ostensible risk that a trader may take to be on the hook for some of his "trick" orders may itself advance the trader's illicit goal to fool the market about the true status of market demand. Regardless, the proper focus is not on whether some part of the trader's conduct can be labeled as legitimate or lawful but whether the conduct in context is part-and-parcel of a scheme to defraud.

Defendant also relies on *United States v. Finnerty*, *supra*, a case in which a trader was prosecuted for profiting by "interpositioning" his own trades between those of his customers. The Second Circuit reversed the trader's securities fraud conviction, concluding that "the government has identified no way in which Finnerty communicated anything to his customers,

let alone anything false," and that there was no fraud proven because "there is no evidence that Finnerty conveyed an impression that was misleading, whether or not it could have a bearing on a victim's investment decision in connection with a security." 533 F.3d at 147-48; *see also id.* at 150 (noting that "[i]t may be that Finnerty unfairly profited from superior information," but that "there must be some proof of manipulation or a false statement, breach of a duty to disclose, or deceptive communicative conduct").

The difference between *Finnerty* and this case is obvious. *Finnerty* involved no deceptive communicative conduct. But this case is all about the indictment's well-pleaded allegations that defendant engaged in fraudulent communicative conduct by placing large "trick" orders on the commodities exchange. The Second Circuit's decision in *Finnerty* does not help defendant here.[3]

The more salient decision of the Second Circuit is *United States v. Regan*, 937 F.2d 823 (2d Cir.), *as amended* 946 F.2d 188 (2d Cir. 1991), in which the court of appeals upheld the securities fraud conviction of traders who sought "by devious means to depress the price" of a stock by having shares shorted through a broker without disclosure of the parties behind the deal. 937 F.2d at 829. The court of appeals observed that "Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices," that the defendants' devious plan "fits comfortably within this full range of wrongful acts," and that "[f]ailure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact." *Ibid.* (internal quotation marks and citations omitted).

---

[3] In somewhat apples-and-oranges fashion, defendant argues that any alleged "trick" orders were not communicative because they were placed on an anonymous exchange. Doc. #76 at 5. This argument makes little sense because the communicative aspect of any market orders did not depend on the identity (known or not known) of other market participants, any more than it could be said that a newspaper only "communicates" if read by named subscribers rather than by those whom anonymously buy from a newsstand.

8

Defendant next relies on the Third Circuit's decision in *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001). But that case actually cuts against defendant, because it recognizes that market fraud may occur if there has been "either injection of inaccurate information into the market *or creation of a false impression of supply and demand for a stock.*" *Id.* at 208 (emphasis added). Such conduct involving the creation of a false impression of supply and demand for precious metals futures is precisely what the indictment alleges against defendant here.

Moreover, the conduct at issue in *GFL* was importantly different from the conduct at issue in this case. *GFL* involved lawful short sales with no suggestion that the seller intended or tried to withdraw or undo any short-sale transaction. By contrast, defendant here is alleged to have lawfully placed orders while intending from the start to cancel these orders before their execution.[4]

In short, I do not agree with defendant's argument that the indictment fails to allege facts that amount to a crime of conspiracy to engage in commodities fraud. The indictment duly tracks the elements of the applicable statutes and properly alleges facts that—if proved—may amount to a conspiracy to engage in commodities fraud.

Defendant further argues that the indictment is unconstitutionally vague. I do not agree for substantially the reasons set forth in the Government's briefing (Doc. #75 at 8-13). The indictment alleges very specific facts that plainly put defendant on fair notice of what the

---

[4] The Government's briefing does not grapple or reckon with the relevant facts or reasoning of the principal cases cited by defendant—*Radley*, *Finnerty*, and *GFL*. Instead, the Government seeks to distinguish these cases on purely technical or procedural grounds. Doc. #75 at 5-6 (arguing that *Radley* ended up being decided on alternative grounds, that *Finnerty* involved a post-trial motion for judgment of acquittal, and that *GFL* involved a civil summary judgment motion). These technical points of distinction were not helpful to my consideration of whether the factual allegations of the indictment are legally sound.

9

Government alleges that he did wrong. Accordingly, I will deny defendant's motion to dismiss the indictment insofar as defendant contends the indictment is void for vagueness.

Defendant's motion to dismiss raises additional arguments that are now moot in light of the dismissal of the substantive counts. Defendant's challenge to alleged prejudicial surplus in the indictment may be renewed at the time of jury instructions and in consideration of the Court's practice not to submit the indictment *in toto* to the jury.

## CONCLUSION

The motion to dismiss the indictment (Doc. #66) is DENIED. This ruling is solely as to the adequacy of the indictment on its face and without respect to any evaluation of the legal sufficiency of evidence that may be presented at trial.

It is so ordered.

Dated at New Haven this 20th day of March 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge