

Marc Mukasey
Tel 212.801.6832
Fax 212.754.8522
mukaseym@gtlaw.com

April 3, 2018

VIA CM/ECF

The Honorable Jeffrey A. Meyer
U.S. District Judge for the District of Connecticut
Richard C. Lee U.S. Courthouse
141 Church Street
New Haven, Connecticut 06510

      Re: *United States v. Flotron*, S1 17 Cr. 220 (JAM)

Dear Judge Meyer:

      This letter is respectfully submitted in response to (1) the government's March 30, 2018 letter (ECF No. 176) regarding alleged conspiracies that "straddle" the enactment of the statute prohibiting the charged conduct, and (2) the April 2, 2018 letter (ECF No. 177) regarding the government's proposed use of UBS compliance materials.

      The defense agrees with the general proposition that, under Second Circuit law, the government may charge a conspiracy that predates the enactment of the operative statute. However, a robust instruction to the jury on this issue is critical to avoid the possibility that Mr. Flotron is convicted based on conduct that predated enactment of 18 U.S.C. § 1348, which would create precisely the Ex Post Facto violation that the Second Circuit has deemed unconstitutional. This is particularly true given the anticipated trial evidence in this case, which the defense submits will demonstrate that Mr. Flotron never entered into any agreement to commit commodities fraud or any other crime. The evidence will show that his trading strategies were legitimate, market-accepted strategies and that he acted in good faith.

**I.    APPLICABLE LAW**

      The Ex Post Facto Clause states that "[n]o . . . ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. Among other things, this clause prohibits Congress from passing a law that "makes an act a crime that was legal when committed." *See Collins v. Youngblood,* 497 U.S. 37, 41–42 (1990). The Ex Post Facto Clause "ensures that individuals have been provided fair notice of conduct that will subject them to criminal sanctions and it is a check against vindictive legislation." *United States v. Alkins*, 925 F.2d 541, 549 (2d Cir. 1991).

      "While the Ex Post Facto Clause itself is a restraint on the legislative branch, its protections have been extended to the application of judicial precedent by the courts under the Due Process Clause of the Fifth Amendment." *United States v. Harris*, 79 F.3d 223, 228-29 (2d Cir. 1996). Although it is not a due process violation when a defendant is convicted of a continuing offense that began prior to, but continued after, the enactment of a statute prohibiting that offense, a defendant's due process rights *are* violated if there is a possibility that his

April 3, 2018
Page 2

conviction was based solely on pre-enactment conduct.  *Id.* at 229; *see also United States v. Ghavami*, No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *12 (S.D.N.Y. July 13, 2012) (holding that a conspiracy that straddles a statute's enactment date will run afoul of the Ex Post Facto clause if it was possible for the jury to convict on pre-enactment conduct); *see also United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999) (a conspiracy conviction will "not run afoul of the Ex Post Facto clause unless it was possible for the jury, following the court's instructions, to convict 'exclusively' on pre-enactment conduct").

On multiple occasions, the Second Circuit has made clear that, in order to avoid violating a defendant's Ex Post Facto rights, there must be clear proof of an *agreement* to violate the law between the defendant and his alleged coconspirators that postdates the enactment of the operative statute.  As stated by the Second Circuit in *Monaco*:

> Specifically, the jury reasonably could have found that the DeMaios *agreed* to serve as nominee owners of the Miramar property in 1980; that *their agreement* to play this role continued after 1986; that this ongoing *agreement* is evidenced by their taking tax deductions related to the property in 1987, 1989, and 1990 (to keep up the appearance of ownership); and that their continuing role as nominees was demonstrated when they sold the Miramar property in 1989 and immediately remitted the money to James to pay Jimmy's legal bills.  Likewise, the jury could have concluded that an ongoing *agreement* existed regarding the DeMaios' home . . . .

194 F.3d 381, 386-87 (2d Cir. 1999) (emphases added); *see also United States v. Ferrara*, 458 F.2d 868, 874 (2d Cir. 1972) ("Although the evidence established that the initial agreements among appellants Walgreen and Wechsler Coffee were consummated in 1954, there was clear proof that the conspiracy *was reaffirmed and adhered to* long after September of 1959.") (emphasis added).

## II.     FACTUAL BACKGROUND OF THIS CASE

The conspiracy charge against Mr. Flotron is premised upon 18 U.S.C. § 1348, which the government acknowledges was not amended to encompass commodities fraud until May 20, 2009.  This date is particularly critical given the facts of this case.

The Superseding Indictment (the "Indictment") states that Mr. Flotron trained Kar-Hoe ("Mike") Chan, the government's primary cooperating witness, "[i]n or around July 2008." Indictment ¶ 15(a).  Moreover, it is beyond dispute that Chan transferred to UBS's Singapore office in April 2009, and that he and Mr. Flotron were never based in the same office together after that time.  While the Indictment contains a bare-bones allegation that "[i]n or around October 2008 through in or around October 2012, and based on FLOTRON's training and instruction, [Chan] entered Spoof Orders in the precious metals futures markets," the evidence will show that Flotron and Chan had no interactions or coordinated conduct that could establish the necessary elements of a conspiracy after the alleged initial training.  This is confirmed by the government's own interview memoranda:

April 3, 2018
Page 3

> CHAN recalled the spoofing activity from 2008 in regard to FLOTRON because CHAN spent time shadowing and observing FLOTRON during his training. *In 2011, CHAN had his own book to be responsible for and did not have time to observe FLOTRON or any of the other traders. However, CHAN believed that FLOTRON was still spoofing since it was still a common industry practice at that time.*

Sept. 16, 2016 FBI Interview Memo, at 3 (emphasis added). Certainly, a witness's assumption that a defendant was committing an unlawful act because "it was still common industry practice" is not valid evidence that could support a conspiracy conviction.

The potential that the government may present a second cooperating witness at trial does not alter the scenario as it applies to the timing of the charged conspiracy. Like Chan, the government's second cooperating witness, Sergio Soler, was never based in the same office as Mr. Flotron from the date that 18 U.S.C. § 1348 was amended (May 20, 2009) until Soler left UBS in March 2010. More importantly, the government's disclosures make clear that Soler, again like Chan, never entered into any agreement with Mr. Flotron to commit commodities fraud. As stated in the government's interview memorandum:

> To adapt, if SOLER needed to fill an order, he began to place[] a large order in the market to create a false impression to the market and placed another order opposite of it, which got filled. *SOLER did not recall discussing this with FLOTRON directly.* However, SOLER believed FLOTRON would have been aware SOLER was doing this since FLOTRON was on the desk and would have seen SOLER doing it in Swiss key. SOLER explained, if FLOTRON filtered out SOLER's trades, then he would have not seen SOLER's trades.
>
> * * * *
>
> SOLER could not recall a time prior to the markets going electronic in 2006-2007 where he D[odd] F[rank]-spoofed and FLOTRON praised or critiqued him as a result of DF-Spoofing. *SOLER would not be surprised if FLOTRON himself had DF-spoofed but could not recall any specific instances.* During SOLER's time trading PM, DF-Spoofing seemed to be a normal practice on the trading desk, like making a phone call. It was just something you did. Normal practice.

Mar. 1, 2018 FBI Interview Memo, at 4-5 (emphases added).

The importance of a robust and clear jury instruction is evident given the above factual background. Absent such an instruction, it is highly likely, if not certain, that any conviction that the government might theoretically obtain against Mr. Flotron for conspiring to violate 18 U.S.C. § 1348 would be premised exclusively on pre-enactment conduct. This would be an impermissible violation of Mr. Flotron's constitutional due process rights stemming from the Ex Post Facto clause.

April 3, 2018
Page 4

### III.    DEFENDANT'S PROPOSED JURY INSTRUCTION

In light of the above case law and factual background, the defense objects to multiple aspects of the government's proposed jury instruction on the "straddling" issue.

First, we object to the government's proposal that the jury not be informed of the significance of the date when 18 U.S.C. § 1348 was amended.  *See* Gov't Proposed Instruction, ECF No. 176 at 2 ("You need not speculate about the special significance of that date [May 20, 2009], which relates to legal matters that you need not concern yourselves with.").  Regardless of whether or not evidence is presented at trial regarding the timing of the amendment, there is no reason to provide the jury with such a purposefully opaque instruction.  This would do little more than minimize the significance of the overall instruction, while also confusing the jurors and inviting them to speculate about the significance of the May 20, 2009 date.

The jury should be made aware of the reason why any alleged conspiracy must have existed after May 20, 2009 in order to convict Mr. Flotron of Count One.  This will place the date in proper context, and also comports with similar instructions from other cases in the Second Circuit.  *See United States v. Ghavami*, No. 10-cr-01217-KMW (S.D.N.Y.) (ECF No. 278 at 38-39) ("As I have told you, Counts Two and Four each charge a conspiracy to commit wire fraud, in violation of 18 U.S.C., 1349.  That statute was enacted on July 30, 2002.").

We submit that the first paragraph of the defense's proposed instruction adequately and accurately explains the reason that the jury is being instructed on this issue:

> As I have explained, the government has alleged that the defendant engaged in a conspiracy, the object of which was to commit commodities fraud in violation of 18 U.S.C. § 1348.  This statute, however, did not take effect for commodities until May 20, 2009.  In other words, commodities fraud, as defined in 18 U.S.C. § 1348, was not a crime until May 20, 2009.

ECF No. 168 at 24 (Deft. Proposed Instruction 19).

Second, we object to the government's proposed instruction that "to convict the defendant on Count One . . . you must find that the conspiracy continued after May 20, 2009."  As a matter of law, no "conspiracy" could have existed prior to May 20, 2009, because the commodities fraud statute was not yet enacted and could not have been an illegal object of any agreement.  Thus, it is impossible for any "conspiracy" to have "continued" from any point prior to that date.[1]  Instead, the jury must determine whether or not the government has proven that all of the required elements of the charged conspiracy existed after May 20, 2009.  The defense's proposed instruction addresses this concern, by avoiding any reference to a "continuing conspiracy":

---

[1] This phrasing is particularly prejudicial in light of the government's proposed instruction that once a person is found to be a member of a conspiracy, "he is presumed to continue his membership in the venture until the last act in furtherance of the conspiracy unless it's shown that he withdrew and disassociated himself from it."  ECF No. 166 at 25 (Gov't Proposed Instruction 11).

GREENBERG TRAURIG, LLP  ■  Attorneys at Law  ■  www.gtlaw.com

April 3, 2018
Page 5

> [I]n order for you to find the defendant guilty of engaging in a conspiracy to commit commodities fraud, you must find beyond a reasonable doubt that the alleged conspiracy existed after May 20, 2009, and that the defendant agreed to be a member of the conspiracy after that date. In other words, you must find the defendant not guilty unless you find beyond a reasonable doubt that he and at least one co-conspirator had an agreement to commit commodities fraud that existed after May 20, 2009.

This proposed instruction comports with the Second Circuit case law described above and should properly prevent the jury from potentially convicting Mr. Flotron based solely on pre-enactment conduct.

**IV.     MR. FLOTRON'S GOOD FAITH**

The importance of a robust straddling instruction is even more heightened in this case given the possibility that evidence will be admitted at trial regarding UBS's compliance policies. The government intends to offer testimony by James Oates, UBS's chief compliance officer, as well as UBS compliance documents that address the concepts of market manipulation and "spoofing." The government will presumably offer such evidence in an attempt to show that Mr. Flotron should have known that his trading activity, as alleged in the Indictment, was unlawful. Mr. Flotron may rebut this assertion and provide evidence of his good faith belief in the legality and legitimacy of his actions.

The term "spoofing" was not referenced in any UBS compliance document until mid-2012, several years after the amendment of 18 U.S.C. § 1348. Even then, UBS's compliance documents provided vague and contradicting views of what spoofing meant and the types of products to which it applied. That is likely due to the widespread confusion in the marketplace, and among the regulators, regarding the concept of spoofing. The defense may seek to introduce evidence of the following events that relate to the ever-changing definition of spoofing throughout the alleged conspiracy period in support of Mr. Flotron's good faith defense.

Dodd-Frank was not enacted until July 2010, and did not take effect until July 2011. Among other things, this statute amended the Commodities Exchange Act to add an "anti-spoofing" provision. This provision prohibits "spoofing," which it vaguely defines as "bidding or offering with the intent to cancel the bid or offer before execution." *See* DX 186 (excerpt of Public Law 111-203, 124 STAT. 1739, §§ 747, 754). This provision, if taken literally, would capture vast amounts of bona fide and normal trading activity that could not be considered criminal, or the type of conduct intended to be encompassed by the statute. That is because cancellation of orders, particularly in the futures market, is entirely permissible and routine. In other words, traders frequently place orders into the market with the expectation that there is a high likelihood that they may be cancelled if no counterparty executes against them.

April 3, 2018
Page 6

After the passage of Dodd-Frank, the CFTC and market participants recognized that the scope and meaning of the "anti-spoofing" provision were unclear.[2] It was not until May 2013 that the CFTC issued final interpretive guidance. *See* DX 196 (78 Fed. Reg. 31,890 at 31,896 (May 28, 2013)). That guidance stated that "a spoofing violation will not occur when the person's intent when cancelling a bid or offer before execution was . . . as part of a legitimate, good-faith attempt to consummate a trade." *Id*. at 31,896. "When distinguishing between legitimate trading (such as trading involving partial executions) and 'spoofing,'" the CFTC explained that it would "evaluate the market context, the person's pattern of trading activity (including fill characteristics), and other relevant facts and circumstances." *Id*.

It was not until August 2014 – after the end of the charged conspiracy and after Mr. Flotron had left UBS – that CME Group published its anti-spoofing rule, which finally provided guidance to market participants about what type of trading activity would violate the rules of the futures exchange. *See* DX 189 (CME Group RA 1405-5, at 5 (Aug. 28, 2014)).

The confusion in the marketplace regarding the concept of spoofing and the belated efforts by the CFTC and CME to define its contours, provides context and significant evidence of Mr. Flotron's good faith. As Judge Chatigny recently observed:

> [D]ue process doesn't allow you to use the criminal justice system to draw lines. The lines have to be clear. . . . We're talking about the line that separates criminal from non-criminal. It has to be clear. You can't use the criminal law to establish it. It's got to be there beforehand.

*United States v. Shapiro et al.*, No. 3:15-cr-155 (D. Conn.), May 9, 2017, Trial Tr. at 275:4-14.

The defense submits that evidence regarding the above events is relevant and should be admitted at trial.

---

[2] In an attempt to clarify the meaning of the anti-spoofing provision, in November 2010, the CFTC sought public comment, and later held a roundtable, through which it received input from many different market participants. *See* DX 192 (75 Fed. Reg. 67,301 (2010)). The CFTC decided to prepare an "interpretive order" regarding the disruptive practices provision. The CFTC first issued a *proposed* interpretive order in March 2011. *See* DX 193 (76 Fed. Reg. 14,943 (2011)). This proposed order was tentative and non-binding. *See* CFTC Q&A – Proposed Interpretive Order on Disruptive Trading Practices, available at http://www.cftc.gov/idc/groups/public/@newsroom/documents/file/pidtp_qa.pdf (last visited Dec. 18, 2017) ("The Proposed Interpretive Order is a proposal — it does not bind the Commission or the public."). But even in this preliminary interpretive order, the CFTC provided only loose guidance as to the scope of the spoofing provision, stating that "if a person's intent when placing a bid or offer was to cancel the entire bid or offer prior to execution, regardless of whether such bid or offer was subsequently filled, that conduct ***may*** violate section 4c(a)(5)(C)." *Id*. at 14,947 (emphasis added). The CFTC added that "under this interpretation, section 4c(a)(5)(C) will not capture legitimate trading." *Id*. at 14,947. The CFTC also received written comments from industry members confirming that "spoofing" had no accepted meaning in the futures markets. *See, e.g.*, Letter from John M. Damgard, President of the FIA, at 1, 3, 6 (Dec. 23, 2010) ("The term 'spoofing' is not one that has been commonly used in the futures and derivatives markets and there is no generally understood or accepted meaning of the term in this context.").

April 3, 2018
Page 7

        Respectfully submitted,

        GREENBERG TRAURIG, LLP

By:  /s/ Marc L. Mukasey
     Marc L. Mukasey (ct29885)
     Nathan J. Muyskens (phv09472)
     Daniel P. Filor (phv08911)
     200 Park Avenue
     New York, NY 10166
     Telephone: (212) 801-6832
     Facsimile: (212) 801-6400
     *Attorneys for Defendant Andre Flotron*