UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ANDRE FLOTRON,<br><br>Defendant. | S1 17 Cr. 220 (JAM)<br><br>April 11, 2018 |

**DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE THE GOVERNMENT FROM INTRODUCING IMPOROPER SUMMARY EXHIBITS**

Defendant Andre Flotron respectfully submits this Motion *in Limine* to Preclude the Government from Introducing Improper Summary Exhibits.

**PRELIMINARY STATEMENT**

On April 9, 2018, the government provided the defense with the exhibits that it intends to introduce at trial pursuant to Rule 1006 of the Federal Rules of Evidence, including the government's so-called "omnibus" exhibits relating to Mr. Flotron and the government's primary cooperating witness, Kar-hoe "Mike" Chan. The defense objects to the introduction of the "omnibus" exhibits, as the government cannot lay an adequate foundation for their admissibility.

In addition, although the government characterizes nearly all of its April 9 exhibits as Rule 1006 summaries, most of these proposed exhibits – including the omnibus exhibits – are not "summaries" of underlying data, but are instead demonstrative aids intended to present an argumentative interpretation of Flotron and Chan's trading activity to the jury. They contain only selected snippets of data that have been hand-picked by the government, without any apparent fixed parameters or statistical foundation. And they contain illustrative charts and argumentative descriptions that go beyond the presentation of summary information. While certain of these documents may be permissible as demonstrative aids, many are not proper

summary exhibits. Rule 1006 is designed to allow parties to summarize voluminous data in an impartial manner to assist juries in understanding the underlying evidence, not to summarize the government's theory of the case. For these additional reasons, several of these exhibits, as specifically identified below, should be excluded.

## FACTUAL BACKGROUND

On April 9, 2018, the government provided the defense with approximately 50 exhibits that it intends to introduce at trial pursuant to Rule 1006 of the Federal Rules of Evidence. This production included the government's so-called "omnibus" exhibits (GX 126 and GX 127), which are each comprised of hundreds of individual charts and corresponding narrative descriptions. The government had provided the defense with an single example chart from GX 127 at the pretrial conference on April 6, 2018.

The government previously represented to defense counsel and the Court that its omnibus exhibits would address 538 trading sequences by Flotron and 274 trading sequences by Chan. The omnibus exhibits that the government actually disclosed, however, addressed a different number of trading sequences: 375 for Flotron and 159 for Chan. This change has required the defense to yet again redo a multitude of its own statistical analyses to prepare for trial. During a telephonic meet-and-confer, the government explained to defense counsel that this change resulted from two things.

First, the government removed certain of these trading sequences because it claims that it did not have sufficient data to present them at trial. The government apparently made this decision despite acknowledging this same issue at an earlier conference and stating that it would still include these sequences at trial.

> MR. ZINK: Sure. They are -- the omnibus list of episodes includes -- there are 538 episodes at issue. We do not have full and complete market data for 2008

2

> and 2009. So we're not going to have visual depictions of the market at that point in time. But Ms. Pinheiro has taken the parameters we've given her, based on what Mr. Chan will testify to, and testify that there were 11 times that it happened at the defendant's own hand between January 1, 2008, and July 1, 2008.

Mar. 29, 2018 Tr. at 70:16-24.

Second, the government showed the remaining 472 Flotron trading sequences to Chan, who informed them that 97 of them did *not* appear to be examples of spoofing. The government subsequently removed these sequences. Again, this development was surprising to the defense, as the government had asserted at previous conferences that all of the 538 trading sequences on the previous version of the Flotron omnibus exhibit constituted criminal activity.

> THE COURT: . . . Should I be concerned that at one point in time the government thinks that there's 25 transactions that show criminal conduct and now it's stepping away from that, or is it just that these transactions are less compelling than the other transactions on the now slimmed-down list? Help me understand what's going on there.
>
> MR. PERRY: I hope Your Honor does not have that concern. The changing of the list from the top 25 to the current list of ten or twelve isn't because we don't think there are 25 episodes that were criminal in nature. *Indeed, we are prepared to put on 538 for Mr. Flotron that we believe are criminal in nature.* It's simply a question of trying to put our best foot forward and our best evidence in . . . .

Mar. 12, 2018 Conf. Tr. at 51:16-52:20 (emphasis added). In addition, the government later stated after jury selection that Chan had already personally reviewed every one of the trading sequences.

> MR. PERRY: Precisely. Mr. Chan will have reviewed -- has already reviewed every one of the omnibus -- of the charts in both omnibus exhibits with particular focus on the ones we intend to show him at trial. He has set eyes on each one of them . . .

Apr. 6, 2018 Conf. Tr. at 14:13-18.

Accordingly, the remaining population of 375 omnibus trading sequences for Mr. Flotron are not the result of any sort of statistical foundation or parameters, but are simply a cherry-

picked group of trading sequences isolated by the government that Chan, based on his own undefined criteria, has deemed to be examples of spoofing.

The government has asserted that these omnibus exhibits, along with the numerous other exhibits that it disclosed on April 9, constitute summaries pursuant to Rule 1006. As the government stated at a recent conference, "Ms. Pinheiro . . . will be offering no conclusions about anything. She is our 1006 witness who has taken the CME data and has analyzed it consistent with the parameters the government has provided to her." Mar. 29, 2018 Tr. at 43:22-44:1; *see also id.* at 46:16-19 (COURT: So there she's not, in your view, bringing expertise to bear; she's just basically crunching data? MR. ZINK: Here's what the data shows. COURT: All right.").

## ARGUMENT

The government's omnibus exhibits are not proper Rule 1006 summaries for several reasons. First, there is no foundation for the government to include summary charts for these hundreds of trading sequences. Second, they contain more than mere summary information, and instead also include argumentative depictions and descriptions. Third, they are misleading because they exclude certain trading activity, presumably because such activity does not comport with the government's theory of the case.

In addition to the omnibus exhibits, several of the government's other proposed summary exhibits are improper. These exhibits, as identified and discussed specifically below, contain argumentative, misleading, and prejudicial information that should not be presented to the jury.

## I.   APPLICABLE LAW

Pursuant to Fed. R. Evid. 1006, "[t]he contents of voluminous writings . . . which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Rule 1006 is an exception to the best evidence rule. *Highland Capital*

*Management, L.P. v. Schneider*, 551 F.Supp.2d 173, 190 (S.D.N.Y. 2008). "Summary charts should not be admitted unless a proper foundation is established connecting the numbers on the chart with the underlying evidence." *United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986). When the government seeks to introduce summary charts, "the court must ascertain with certainty that they are based upon and fairly represent competent evidence already before the jury." *United States v. Conlin,* 551 F.2d 534, 538 (2d Cir.1977); *see also United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) (warning that charts must be nonprejudicial and presented in a "nonmisleading manner" because "a summary [chart] containing elements of argumentation could very well be the functional equivalent of a mini-summation by the chart's proponent every time the jurors look at it during their deliberations"). If a proposed exhibit does not meet these requirements and is "more likely to confuse or mislead the jury than it is to assist it," it is inadmissible. *Citron*, 783 F.2d at 316, *citing* Fed. R. Evid. Rule 403.

When a summary exhibit is based "on the government's factual assumptions . . . the foundational element of accuracy is particularly important." *United States. v. Taylor*, 210 F.3d 311, 315-16 (5th Cir. 2000) (finding that the district court erred in admitting a summary chart that "did not accurately reflect the underlying testimony"). Courts should not admit a summary exhibit that allows "the government to assume that which it was required to prove beyond a reasonable doubt as operative facts of the alleged offense." *Id.* at 316. The Second Circuit has specifically cautioned that:

> A chart submitted by the prosecution is a very persuasive and powerful tool and must be fairly used, since, by its arrangement and use, it is an argument to the jury during the course of the trial. . . . A chart which for any reason presents an unfair picture can be a potent weapon for harm, and permitting the jury to consider it is error.

*Conlin*, 551 F.2d at 538–39.

In addressing whether or not a document is a proper summary exhibit, courts must distinguish between summary exhibits under Rule 1006 and in-court demonstratives under Rule 611(a).  *See Gomez v. Great Lakes Steel Div., Nat. Steel Corp.*, 803 F.2d 250, 257 (6th Cir. 1986) ([add parenthetical]).  Summary exhibits under Rule 1006 must "fairly represent" the underlying voluminous evidence in an "accurate and nonprejudicial" way.  *Id*.

> Such summaries or charts admitted *as evidence* under Rule 1006 are to be distinguished from summaries or charts used as pedagogical devices which organize or aid the jury's examination of testimony or documents which are themselves admitted into evidence.  Such pedagogical devices are more akin to argument than evidence. . . .  Quite often they are used on summation.

*Id*. (internal citations omitted) (emphasis in original).

Exhibits are accurately characterized as demonstrative aids or "pedagogical devices" when they "reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent." *Bray*, 139 F.3d at 1111.  For instance, a chart can serve as a pedagogical demonstrative at trial, but not as a Rule 1006 summary, when the chart includes a synthesis of data based on assumptions and inferences.  *Eichorn v. AT&T Corp.*, 484 F.3d 644, 650 (3d Cir. 2007) ("The plaintiffs' proffered calculations are better described as a synthesis rather than a summary of the charts . . . [because] [t]he calculations went beyond the data they summarized and included several assumptions, inferences, and projections"); *see also Gomez*, 803 F.2d at 258 ("Exhibit No. 5, despite its heading of "Summary of Actual Damages" projected future events and economic losses, and was therefore not a simple compilation of voluminous records.").  In such cases, the summaries are "more akin to argument than evidence." *Gomez*, 803 F.2d at 257.

On this subject, *United States v. Hart* is instructive.  295 F.3d 451 (5th Cir. 2002).  In that case, the defendant was convicted for making false statements on applications for farm loans by failing to disclose certain debts on his Farm and Home Plan (FHP).  *Id.* at 452-54.  At trial, the

government prepared a summary chart of the defendant's undisclosed debts and introduced the chart through a summary witness. *Id.* at 458-59. On appeal, the court reversed the conviction because the jury could have assumed from the summary exhibit that "the *full amount* of those debts shown *belonged* on a *properly prepared* FHP. *Id.* at 459 (emphasis in original). The court emphasized that "the government cannot use a 'summary' chart under FRE 1006 to assume that which it was required to prove beyond a reasonable doubt as operative facts of the alleged offense. *Id.* (internal quotation marks omitted). Accordingly, the circuit court found that the district court abused its discretion in admitting the chart as a summary exhibit under Rule 1006. *Id*.

## II.   THE GOVERNMENT'S OMNIBUS EXHIBITS ARE NOT PROPER RULE 1006 SUMMARIES

The "omnibus" exhibits proffered by the government (GX 126, GX 127, and their sub-parts) should be excluded for multiple reasons. First, the government cannot lay an adequate foundation for their admission. In addition, they are far more than mere summaries of trading data, as the government has previously represented. Rather, they are argumentative and misleading depictions and descriptions intended to skew the jury's interpretation of the data.

### A.   The Government Cannot Lay an Adequate Foundation for Admission of the Summary Charts

The government's reasoning for admission of the omnibus charts as summary exhibits is entirely circular. On the one hand, the government has previously represented that the omnibus exhibits would be premised upon specific and defined parameters. *See* Mar. 29, 2018 Tr. at 43:22-44:1 ("Ms. Pinheiro . . . will be offering no conclusions about anything. She is our 1006 witness who has taken the CME data and has analyzed it consistent with the parameters the government has provided to her."). On the other hand, the government now acknowledges that there is no such statistical basis for the omnibus exhibits. Rather, these trade sequences were

simply selected by the government based on its own view of what constituted fraudulent activity, converted into illustrative charts by an outside consultant, and then culled by Chan through his out-court-review based on undefined criteria.  This is not sufficient foundation to admit them as summary exhibits at trial.

Ms. Pinheiro cannot lay an adequate foundation for admission of these exhibits.  She did not select the underlying population of data using any defined criteria that would make these true summaries of voluminous data.  To the extent any criteria were used, they do not correspond to any particular parameters that will be set forth by fact witnesses at trial.  Moreover, Ms. Pinheiro has no independent knowledge of this trading activity or its significance.  She has simply chosen what data to "summarize" based on an ad-hoc list of trading sequences created by the government.

Chan cannot lay an adequate foundation either, as the government has conceded.  Apr. 6, 2018 Conf. Tr. at 17:15-19 ("MR. PERRY: . . . [T]hat's why I started by saying we think these are 1006 charts that should be admitted and should go back to the jury.  I was simply meaning to say as to Mr. Chan, he can't lay that foundation.").  Chan himself has never even looked at the underlying data for the omnibus exhibits.

> MR. PERRY: . . . So the underlying evidence . . . is enormous.  It's terabytes of data. It's contained on hard drives and so forth.  These are summaries of that evidence.  Mr. Chan has not gone onto the hard drive and looked at the actual evidence from CME.  He's looked at our summaries, really Ms. Pinheiro's summaries of that evidence.  So he couldn't say, for instance, that that was the exact millisecond of an order, that was the second price, because he hasn't looked at the underlying data.  Only Ms. Pinheiro has done that.
>
> THE COURT: Okay.
>
> MR. PERRY: So Mr. Chan could say, you know, here's what happened in this example, but he couldn't say, and the numbers on this chart I can confirm are accurate by my review of the underlying data from the CME. It's not his summary.

8

Apr. 6, 2018 Conf. Tr. at 15:4-21.  Thus, he cannot possibly determine whether any of the omnibus charts are accurate, provide a complete picture of Mr. Flotron's trading activity during the relevant timeframe, or match any defined parameters.

In addition, Chan has no personal knowledge or recollection of any of these trading sequences.  There is no evidence that he was involved in the entry of any of the corresponding futures orders or that he has any knowledge of Mr. Flotron's intent when entering any of the orders.  Nor has he selected these trading sequences using any defined criteria that would serve as an adequate foundation to introduce them *en masse* at trial.

Even if the Court finds that there is an adequate foundation for admission of certain of the omnibus charts, those charts should be limited to the trade sequences that the government specifically addresses with Chan at trial.  The government should not be permitted to introduce hundreds of additional summary charts that lack adequate foundation.

If these charts were the result of defined parameters set forth by a specific witness, there could arguably be an evidentiary foundation for their admission.  However, that is not the case here.  The 375 trading sequences from the omnibus exhibit for Mr. Flotron are indisputably *not* based on defined parameters, as the government has previously represented they would be.  Mar. 29, 2018 Conf. Tr. at 70:20-22 (stating that "Ms. Pinheiro has taken the parameters we've given her, based on what Mr. Chan will testify to", to create the omnibus exhibits).  As described above, the only basis for the government's decision about which trading sequences to include in the omnibus exhibits is Chan's out-of-court opinion – a opinion that is not based on any personal recollection of the specific trading sequences or even defined parameters.  Thus, there is no evidentiary foundation for the government to admit summary charts relating to 375 Flotron trading sequences *en masse*.

B.     **The Omnibus Exhibits Are Needlessly Cumulative and Unfairly Prejudicial**

A summary exhibit is also inadmissible if it is needlessly cumulative or unfairly prejudicial under Rule 403. *See Citron*, 783 F.2d at 316. The risk of unfair prejudice is heightened where, as here, the summary charts summarize voluminous records in which the underlying data would be difficult for a jury to understand. *United States CFTC v. Worth Group, Inc.*, 2015 U.S. Dist. LEXIS 186048, at *9 (S.D. Fla. July 29, 2015) (finding summary exhibit misleading in precious-metals trading case where methodology was faulty). The danger is so great because when "faced with the extremely voluminous records contained in the database themselves, the jury will rely heavily, if not exclusively, on the parties' analyses of the data." *Id*.

The court in *Comite* addressed a similar situation to the one presented here. In that case, the defendant was charged with health care fraud for "upcoding" her medical procedures. *United States v. Comite*, No. CRIM.A.06 70, 2006 WL 3791340, at *1 (E.D. Pa. Dec. 21, 2006). The government sought to prove certain instances of "upcoding" at trial and then submit summary charts that detailed 1,456 additional allegations of "upcoding." *Id*. at 7. The court determined that such voluminous evidence was "troublesome in the trial context" because, "the Defendant . . . has the right to engage in extensive cross examination, possibly on every line entry, which could take days, if not weeks." *Id*. Since the summary charts were alleging essentially the same conduct that the government was proving with specific instances, the charts themselves added little probative value. *Id*. Accordingly, the summary charts, "would be likely to be prejudicial to the Defendant, would take a great deal of additional time, particularly with respect to cross examination related to the government's charts, and would be needlessly cumulative." *Id*.

Here, the government is attempting the same thing the government tried in *Comite*. The government seeks to discuss several instances of alleged spoofing with Chan in detail and then

introduce hundreds of additional instances through its proposed summary exhibits that it claims will show essentially the same conduct. Doing so will have little probative value, because, as discussed above, the government will not address these trading sequences with any fact witnesses at trial. The risk of prejudice, however, is high. Presenting hundreds of charts to the jury without any context creates the danger that jurors may convict Mr. Flotron based solely on the number of trading episodes that the government has asserted to be fraudulent, without having addressed them at trial. As the Court has already indicated, "[there are] 403 issues there if in fact the government doesn't tie it out and just essentially throws a telephone book of information of transactions that aren't explained." Dec. 4, 2017 Conf. Tr. at 21:14-17.

## C. The Government's "Omnibus" Exhibits Are Argumentative

Even if the Court finds as a threshold matter that there is sufficient foundation to admit the omnibus exhibits, they should be excluded because they are not simply summaries, but are instead highly argumentative demonstrative aids. The upper portion of each document within GX 126 and GX 127 contains a color-coded illustration of certain order and market activity. Underneath each graph is an array of information, taken from multiple data sources, and selectively displayed in descriptive captions. These captions in particular are highly argumentative and present several conclusions that go beyond simple number-crunching. *See Stafford v. United States*, No. 3:12-CV-0909, 2013 WL 140605, at *11 (M.D. Tenn. Jan. 11, 2013) ("The fact that the exhibits included headings and color coding, and that they pulled together an array of evidence from a multitude of different sources, further demonstrates that these exhibits were not mere summaries falling within the purview of Rule 1006.").

For example, each chart states the number of market participants who supposedly traded futures contracts at a "worse price" while the so-called "large" order was active. This is similar to *Gomez,* in which the court ruled that an exhibit was inadmissible as a Rule 1006 summary in

11

part because the subheading "'Net Damages *Since Discharge* After Deduction of $825.00 Per Month Pension,' assumed the unproven fact of constructive discharge." *Gomez*, 803 F.2d at 258. Likewise here, listing the numbers of traders who traded at a "worse" price *assumes* the existence of a "better" price absent the alleged spoof. Such an assumption will be disputed at trial and is inappropriate to include in a purported "summary" of the underlying data.

In addition, each chart identifies the so-called "Value Difference of [UBS's] Fills" and the "Value Difference of Market Fills" during the time that the "large" order was active. This again goes beyond mere number crunching and crosses into the realm of expert testimony regarding the government's view of alleged gain to UBS or loss to other market participants. Simply because the government avoids the use of the terms "gain" or "loss" in presenting these numbers, that does not make them less argumentative.

These opinionated "summaries" are precisely the sort of illustrative display that is properly categorized as Rule 611(a) demonstrative aids, *not* as evidence under Rule 1006. Far from conveniently summarizing data, the proposed exhibit takes small portions of data from various sources and puts them together in a single graphic to illustrate a point to the jury. It is "more akin to argument than evidence' since [it] organize[s] the jury's examination of testimony and documents." *Bray*, 139 F.3d at 1111. Such charts are effectively the equivalent of a mini-summations during the trial. *Id.* at 1110 ("[A] summary [exhibit] containing elements of argumentation could very well be the functional equivalent of a mini-summation by the chart's proponent every time the jurors look at it during their deliberations").

      D.    <u>**The Omnibus Exhibits Are Misleading Because They Exclude Directly Related Trading Activity**</u>

The government's omnibus exhibit charts should also be excluded because they are misleading and purposefully omit trading activity that is directly related to the orders highlighted

in the charts. The single example provided to the defense on April 6, which relates to a Chan trade sequence on February 28, 2010, demonstrates these omissions. This chart reflects that Chan entered an order to sell 50 futures contracts for gold at 23:37:19.980 CST on February 28, 2010, and then canceled that order at 23:37:23.016. The chart shows that, during the time that this 50-lot order was active, Chan bought five futures contracts, all of which were part of an iceberg order that Chan had entered approximately 17 seconds before the 50-lot order was entered. The government, however, has purposefully omitted the data point that Chan purchased another futures contract (the sixth contract purchased as part of the iceberg order) ***after*** the 50-lot order was canceled. This presents the jury with the misleading impression that Chan was unable to fill any of his iceberg order outside of the active time of the alleged "trick" order. The government then compounds this misleading impression by presenting the jury with statistics such as the "Time Between *Last* Small Order Fill and Large Order Cancellation." (emphasis added). However, in reality, the "last" small order identified by the government was not actually the last order; it was simply the last order that the government wants the jury to know about.

This same omission is prevalent throughout GX 126 and GX 127. There are many trade sequences "summarized" in which the "small" orders that were filled in the government's depiction (*i.e.*, during the life of the "large" order) are only a portion of the small orders that were actually filled as part of the corresponding iceberg order. Thus, the jury is not being shown the complete picture in regard to orders depicted in the charts. And when the government is presenting data relating to the timing of the "first" small order fill and the "last" small order fill, that data is misleading.[1]

---

[1] GX 139 suffers from the same problem as the GX 126 and GX 127 in this regard. Accordingly, the defense objects to the admission of GX 139.

13

## III. SEVERAL OF THE GOVERNMENT'S OTHER PROFFERED "SUMMARY" EXHIBITS ARE IMPROPER

In addition to the omnibus exhibits described above, several of the government's other proffered exhibits are not proper Rule 1006 summaries, or should be excluded because they are unfairly prejudicial.

### A. Any Exhibits That Reference Notional Values Should Be Excluded

Several of the government's proposed summary exhibits, including the charts contained the omnibus exhibits at GX 126 and 127, contain references to the notional value of the underlying precious metals futures orders or transactions. *See* GX 135, 136, 136(a), 137, 137(a), 140, 141, 141(a), 142, 142(a). For example, GX 135 states that the "Notional Value of Cancelled Contracts" in Mr. Flotron's omnibus trading sequences was over two billion dollars. These notional values have no relevance to the charges against Mr. Flotron and are intended solely to inflame the jury by exposing them to very large dollar values.

Based on its disclosures to the defense, not a single witness will testify that the notional value of any futures order was relevant to his or her trading strategy or decision-making process. Nor do these amounts have any bearing on Mr. Flotron's intent, motive, or any alleged loss or gain. Market participants trading on COMEX would never see these numbers; they would see only the number of futures contracts bid or offered. Even the chairman of the CFTC, in the similar context of the over-the-counter swaps market, has observed that "notional value" is a poor and misleading statistic when assessing the size of a market. *See* Remarks of CFTC Chairman J. Christopher Giancarlo before Derivcon 2018, Feb. 1, 2018 (available at https://www.cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo35) (stating that the financial crisis was "exacerbated by the lack of a more clear, accurate, and honest assessment of risk, value and markets. This was particularly the case in the over-the-counter derivatives markets,

where the notional figures are in the hundreds of trillions of dollars, numbers without meaning, barely comprehensible for any of us.").

Accordingly, these exhibits are unfairly prejudicial to Mr. Flotron. They should be excluded, or, in the alternative, any references to notional values should be removed.

### B. Exhibits Summarizing Alleged "Gain" or "Market Impact" Should be Excluded

Multiple of the government's exhibits purport to summarize the alleged "market impact" resulting from the omnibus trading sequences of Mr. Flotron. These exhibits should be excluded, as they are more than mere summaries of underlying data and also constitute undisclosed expert the testimony.

As detailed in the defense's reply brief in support of its motions *in limine* (ECF No. 154 at 10-11), "market impact" is a highly advanced and difficult statistical concept. A calculation of market impact goes far beyond simple number-crunching and crosses into the realm of highly sophisticated, and often disputable, expert testimony. Such a statistic is not properly included in a Rule 1006 summary exhibit. In addition, the government has repeatedly represented that Ms. Pinheiro, its retained statistical analyst, would not present expert testimony at trial.

### C. GX 145 Should Be Excluded

GX 145 includes two highly prejudicial and inappropriate calculations by the government: the alleged "Gain per Minute" and "Gain per Hour" to UBS, presumably stemming from Mr. Flotron's trading sequences (although the exhibit itself does identify the source of these numbers). These numbers are completely arbitrary, misleading, and irrelevant. Taking the alleged gain to UBS from any particular trading sequence (or an average of all the trading sequences from the omnibus exhibits) and arbitrarily extrapolating that amount to an hourly or minutely rate serves no purpose other than to artificially inflate the monetary value to UBS of the

alleged spoofing episodes.  The absurdity of these calculations is highlighted by the government's own calculation of total gain in GX 144.  While GX 145 asserts that UBS's "Gain per Hour" was upwards of $125,927, GX 144 states that the total gain resulting from Mr. Flotron's alleged spoofing episodes (which ranged over a *five-year* period) was only between $134,200 and $219,905.  GX 145 is simply another attempt by the government to inflame the jury with over-inflated numbers.  It is not a proper summary exhibit, has no probative value, and is also unfairly prejudicial.  Accordingly, GX 145 should be excluded.

**IV.     THE GOVERNMENT'S PROPOSED DEMONSTRATIVES ILLUSTRATING A "BUY-SIDE SPOOFING EPISODE" AND "SELL-SIDE SPOOFING EPISODE" SHOULD BE EXCLUDED**

The government has proffered two animated demonstrative aids (GX 100 and GX 101) that purportedly depict a "Buy-Side Spoofing Episode" and a "Sell-Side Spoofing Episode."  The defense submits that – even if they are not offered as evidentiary exhibits – the government should be precluded from using these demonstratives at trial, as they are unfairly prejudicial and encroach upon the exclusive role of the jury.

By displaying these animations to the jurors, the government seeks to impose on them its view of what a typical spoofing episode looks like.  That is plainly improper.  It is exclusively for the jury to determine whether or not the trading activity at issue in this case constitutes spoofing or commodities fraud.  The government's use of these demonstratives would effectively be an attempt by the government to substitute its view of what constitutes spoofing or commodities fraud for the instructions of the Court and the deliberations of the jury.

The unfair prejudice that would result from the use of these demonstratives is clear.  Before the jury has even seen an example of Mr. Flotron's trading activity, the government would have already showed them a hypothetical trading episode, not based on any underlying data, that it claims is a spoof.  Even more glaringly here, the government has purposefully

depicted a "typical" spoofing episode in a manner that makes it look similar to Mr. Flotron's trading activity. For example, the hypothetical large order depicted in the exhibit is for 33 lots, which is non-coincidentally the same size as the larger order in the vast majority (215) of the trading episodes from the omnibus exhibit for Mr. Flotron. Chan, on the other hand, almost never used this order size in the trading sequences from his omnibus exhibits (only once out of 159 orders). In addition, the government has assumed for the purposes of its depiction that the "[m]arket price rises [or falls] based on perceived demand [or supply]." Here again the government is attempting to circumvent the jury's exclusive role to determine issues such as materiality, or whether or not any of the alleged spoofs at issue in this case actually had any market impact.

The prejudice of these demonstratives is compounded by the fact that the they are wholly unnecessary for the government's presentation. To the extent the government seeks to have Chan explain how he typically spoofed, it can easily do so using one of the summary charts that it already plans to specifically address with Chan at trial (presuming the argumentative aspects of such a chart described *infra* are removed). There is no need to employ a highly prejudicial and purely hypothetical animation of a "spoofing episode."

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests that the Court grant his Motion *in Limine* to Preclude the Government from Introducing Improper Summary Exhibits, and preclude the government from introducing certain of its proffered summary exhibits, as detailed above.

Respectfully submitted,

GREENBERG TRAURIG, LLP

>By:  /s/ Marc L. Mukasey
>Marc L. Mukasey (ct29885)
>Nathan J. Muyskens (phv09472)
>200 Park Avenue
>New York, NY 10166
>Telephone: (212) 801-6832
>Facsimile: (212) 801-6400
>*Attorneys for Defendant Andre Flotron*

## AFFIRMATION OF SERVICE

I hereby certify that on April 11, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
April 11 2018

/s/ Marc L. Mukasey
Marc L. Mukasey (ct29885)
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-6832
Facsimile: (212) 801-6400
Email: mukaseym@gtlaw.com