UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ANDRE FLOTRON,<br><br>Defendant. | S1 17 Cr. 220 (JAM)<br><br>April 22, 2018 |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO GOVERNMENT'S MOTION TO PRECLUDE CERTAIN OF DEFENDANT'S SUMMARY EXHIBITS**

The defense respectfully submits this memorandum of law in opposition to the Government's Motion To Preclude Certain of Defendant's Summary Exhibits, filed on April 22, 2018. ECF No. 206 (the "Motion to Preclude").

**PRELIMINARY STATEMENT**

The government's Motion to Preclude does little but rehash the same mistaken arguments that it raised in its earlier Motion *in Limine* to Preclude Evidence of the Defendant's Good Conduct and Misconduct of Non-Coconspirators (ECF No. 169) (the "Motion *in Limine*"). As the defense stated in opposition to that motion, the government is fundamentally mischaracterizing the purpose for which the defense seeks to introduce summary exhibits. *See* ECF No. 169 (Deft. Opp. to the Motion *in Limine*). These exhibits are entirely proper and directly relevant, because they undercut the government's theory of the case and the highly numerical and statistical approach it has taken to try to prove the intent of Mr. Flotron and the existence of a criminal conspiracy.

The government devoted a substantial portion of its case-in-chief to asserting that the presence of certain alleged trading "patterns" in Mr. Flotron's trading activity are indicative of "spoofing," and that consequently, in the absence of any direct evidence as to what Mr. Flotron's

intent was at the time he engaged in these "patterns," the jury could convict him of fraud. It is entirely proper, and in fact essential, for the defense to be able to rebut this argument by comparing the various hallmarks of these trading "patterns" to Mr. Flotron's broader trading activity, as well as to other market participants generally, during the alleged conspiracy period. That is the only way for the defense to show that, when viewed in the proper context, the trading activity alleged to be fraudulent by the government is in fact entirely legitimate and consistent with the bona fide trading strategies that Mr. Flotron, and market participants generally, employed routinely.

## ARGUMENT

Evidence of uncharged transactions is admissible if it "cast[s] doubt on the government's theory" of the case. *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 708 (S.D.N.Y. 2011); *see also United States v. Balboa*, No. 1:(S1) 12 CR. 196, 2013 WL 6196606, at *3 (S.D.N.Y. Nov. 27, 2013) ("Evidence of a defendant's past 'good acts'" is relevant when "the evidence of 'good acts' would undermine the underlying theory of a criminal prosecution." (citation omitted)); *United States v. Hayes*, 219 F. App'x 114, 115-18 (3d Cir. 2007) (vacating conspiracy conviction and finding that "testimony of non-conspirators and evidence of particular statements or directives" by defendant was admissible because it "was not offered to prove [defendant's] character . . . . Rather, it was offered to show that his actions were inconsistent with conspiring to fabricate test results."); *United States v. Shavin*, 287 F.2d 647, 652, 654 (7th Cir. 1961) (vacating conspiracy conviction and finding that "[t]he Government was properly permitted to introduce evidence of similar transactions to prove fraudulent intent, and conversely the defendant should be entitled to negate the fraudulent intent" with evidence of "similar transactions where he submitted true and correct medical bills.").

That is precisely the purpose of the defense's summary exhibits. Such evidence is even more essential here, because the government's case hinges almost entirely on circumstantial statistical evidence to establish Mr. Flotron's state of mind at the time he entered certain futures orders into the exchange. Not a single witness has testified, nor has any documentary evidence been presented, that directly demonstrates Mr. Flotron's intent at the time he entered the 380 larger orders at issue in the government's "omnibus" exhibit, GX 126. Instead, the government has sought to present statistical evidence, namely the presence of a so-called "pattern" of trading activity, that it asserts is sufficient, in and of itself, for the jury to find that these trading sequences were examples of spoofing. It is critical for the defense to be able to rebut that argument with its own summary exhibits, which "cast doubt on the government's theory." *Rubin/Chambers,* 828 F. Supp. 2d at 708.

      A.      <u>DX 1055, 1056A, 1056B, and DX 1056C</u>

These four exhibits depict certain instances of Mr. Flotron's trading activity, which on their face, share several characteristics of the so-called pattern that the government asserts is indicative of spoofing. Namely, they involve larger orders entered on the opposite side of the market from smaller iceberg orders. As the government correctly observes, the defense intends to use these exhibits to show that the presence of these characteristics is not indicative of spoofing, as evidenced by the fact that Mr. Flotron filled his larger orders in these instances. Without any analysis, the government makes the conclusory assertion that such exhibits constitute inadmissible "good conduct" evidence. That is simply wrong.

The defense must be permitted to present evidence that the alleged "four-step process" that the government claims is one-in-the-same with spoofing, is not indicative of "bad" conduct at all. The most obvious and relevant way for the defense to show that is to offer evidence, by looking at Mr. Flotron's other trading activity, that the characteristics of this "process," are in

3

fact common and do not indicate any fraudulent intent. That is the purpose of these exhibits, which show examples where Mr. Flotron's trading activity included several aspects of the "four-step process," but the larger order was filled, not cancelled. This is highly probative of his lack of fraudulent intent, not only in the trading sequences at issue in GX 1055-1056C, but in other trading sequences (*i.e.*, those in GX 126) which share similar characteristics. Anticipated testimony from defense witnesses will explain why having larger orders opposite smaller iceberg orders would support informative and common trading strategies. The final step in the government's alleged fraudulent scheme is the cancellation of an order, which is typical in a market where the majority of entered orders are cancelled. Accordingly, these exhibits should be admitted.

      B.      <u>DX 1020-1024, 1026, 1027-1028</u>

The government's argument for preclusion of these exhibits effectively recycles the arguments that it made in its Motion *in Limine*. But these exhibits are directly relevant to Mr. Flotron's intent, and serve the purpose, as described above, of demonstrating to the jury that the defining characteristics of the government's alleged four-step process are all common and routine occurrences, thus undercutting the government's assertion that this coincidence of factors is attributable to fraudulent intent. *See* DX 1021-1024 (addressing the frequency with which Flotron and Chan filled and cancelled larger orders); DX 1027-1028 (addressing the frequency with which Flotron cancelled orders in relatively short periods of time). In addition, demonstrating the contrasting trading styles of Flotron and Chan undermines any suggestion that a conspiracy existed between them. *See* DX 1021-1024.

As for DX 1026, which addresses the frequency with which Mr. Flotron entered larger orders with repeating digits, the government has elicited testimony insinuating that the use of

4

repeating digits was another indicator of Mr. Flotron's intent to spoof. For example, Lisa Pinheiro testified as follows:

> Q. So what's true about the order sizes here of the examples contained in 375, the large order sizes?
> A. It's a very general question.
> Q. Is there anything unique about the large order sizes?
> A. I think most of them -- well, all but one have repeating digits would be one of the characteristics.
> Q. That's the 22, the 33, the 44, the 55, the 77, the 99, the 111, and the 222, correct?
> A. That's right.

Trial Tr. at 901:13-21. DX 1026 demonstrates that Mr. Flotron used repeating digits extremely frequently; indeed, 85% of his orders that were at least ten lots in size contained repeating digits. Thus, it is an important exhibit for the defense to show the jury that the occurrence of repeating digits in Mr. Flotron's trading activity was not indicative of spoofing.

DX 1020 also serves the valid purpose of undercutting the government's theory of the case. It is important for the jury to understand, particularly in a highly statistical case such as this, that the government has presented an extremely small portion of Mr. Flotron's trading activity. It is fundamental that, presenting an extremely small sample of a much larger pool of data makes it easier to misinterpret such data and find supposed "trends" or "patterns," especially when those patterns are comprised of frequently occurring characteristics of the larger population that will inevitably overlap. The defense should be permitted to illustrate to the jury that that is precisely what is happening here: the government has taken an extremely large amount of trading activity and isolated a relatively small portion in which certain order characteristics (all of which are common) coincide. This exhibit serves the permissible purpose "undermin[ing] the underlying theory of a criminal prosecution." *Hayes*, 219 F. App'x at 115-18.

### C. DX 1025

The government takes issue with the fact that DX 1025 presents market-wide data for seven selected dates. But as the government concedes in its motion, these seven dates (all of which are clearly identified in the exhibit) correspond to the dates of trade sequences contained in GX 126, which is the reason why they were selected.[1] As both parties have acknowledged throughout this case, the precious metals trading data from CME – particularly when such data include *all* market participants – are extremely voluminous. The defense chose seven individual dates for the simple reason that it would not have been feasible or practical to perform such an analysis for the entire alleged conspiracy period in a reasonable amount of time. To the extent the government wishes to argue at trial that this approach lessens the persuasive effect of this exhibit, it may do so. But that is an issue of weight, not admissibility.

### D. DX 1030

The government objects to DX 1030 as misleading because it "does not indicate whether the ratios [] relate to the visible portion of the 'smaller order' or the entire iceberg itself." The defense is amenable to adding its definition of the term "smaller order" to the bottom of the exhibit to rectify any potential confusion.

### E. DX 1031

The government takes issue with the fact that this exhibit is titled "Percentage of Government's Cancelled Orders Followed by Similar Fills." This title is simply intended to indicate that the exhibit relates only to the orders included in GX 126, as opposed to certain other exhibits that related more broadly to Mr. Flotron's larger body of trading activity. It is highly

---

[1] These particular dates were also selected because they were the dates of trading sequences contained in the government's "Top 25 List" and "Call-Out Examples," which the government previously indicated would be the only sequences potentially presented at trial.

doubtful that this title will result in any confusion to the jury, as it is obvious that the government has not placed any other futures orders at issue in this case.

The government also objects to the fact that this exhibit defines "similar" orders as orders of 90% of the size of the cancelled order. Again, this minor complaint goes to the weight of the exhibit, not its admissibility. To the extent that the government wishes to argue that such a definition of "similar" reduces the persuasive effect of the exhibit, it can do so at trial.

Finally, the government argues incorrectly that DX 1031 should be precluded because it relates to irrelevant "good" conduct. That argument is again erroneous. The frequency with which Flotron or Chan subsequently filled an order of similar size after cancelling an alleged "spoof" order is highly relevant to their respective intents when the earlier large order was entered and cancelled. The contrast between the trading styles of Flotron and Chan is also very informative of the lack of any conspiracy between them. Thus, this exhibit is highly relevant and should be admitted.

F.  DX 1054

The government seeks to preclude DX 1054 as inadmissible hearsay, and further claims that it would be confusing to the jury. Neither is true. First, the hourly graph contained in this exhibit is taken directly from a CME Group publication entitled the "Monthly Metals Review." It is not in dispute that the CME Group operates the commodities futures exchange on which all the trading sequences at issue in this case occurred. Pursuant to Rule 803(17) of the Federal Rules of Evidence, "Market Reports and Similar Commercial Publications" constitute an exception to the rule against hearsay. That rule applies to "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations." The CME report underlying this exhibit falls within this exception.

In addition, the fact that the graph includes information relating to other precious metals products, in addition to gold and silver futures, does not make it confusing.  Each product is clearly represented by a different color, which is defined in the exhibit.  Thus, there is little, if any, risk of confusion.  It would likely be more confusing, and far less practical, for the defense to recreate this chart from scratch to exclude the additional products, instead of using the actual chart contained in the CME report.  Accordingly, this exhibit, and the underlying report, should be deemed admissible.

## CONCLUSION

For the foregoing reasons, the defense respectfully submits that the Government's Motion to Preclude should be denied.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By:  /s/ Marc L. Mukasey
Marc L. Mukasey (ct29885)
Nathan J. Muyskens (phv09472)
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-6832
Facsimile: (212) 801-6400
*Attorneys for Defendant Andre Flotron*

## AFFIRMATION OF SERVICE

I hereby certify that on April 22, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
April 22, 2018

/s/ Marc L. Mukasey
Marc L. Mukasey
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mukaseym@gtlaw.com